<pre>
1                  UNITED STATES DISTRICT COURT
                    DISTRICT OF MASSACHUSETTS
2

3

UNITED STATES OF AMERICA        )
4                                )
vs.                             )  Criminal Action
5                                )
                                 )  No. 15-10338-FDS
6   EDWIN GONZALEZ,              )
                 Defendant       )
7                                )
                                 )

8

9

BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV
10

11

                       JURY TRIAL DAY 12
12

13

14      John Joseph Moakley United States Courthouse
                     Courtroom No. 2
15                    1 Courthouse Way
                     Boston, MA 02210
16
                      June 20, 2018
17                      8:44 a.m.

18

19

20

21
                     Valerie A. O'Hara
22                  Official Court Reporter
        John Joseph Moakley United States Courthouse
23              1 Courthouse Way, Room 3204
                     Boston, MA 02210
24              E-mail: vaohara@gmail.com

25
</pre>

APPEARANCES:

For The United States:

     United States Attorney's Office, by KUNAL PASRICHA,
ASSISTANT UNITED STATES ATTORNEY, and GLENN A. MacKINLAY,
ASSISTANT UNITED STATES ATTORNEY, 1 Courthouse Way, Suite 9200,
Boston, Massachusetts 02110;

For the Defendant Edwin Gonzalez:

     Bourbeau and Bonilla, LLP, by MICHAEL C. BOURBEAU, ESQ.,
80 Washington Street, Norwell, Massachusetts 02061.

ALSO PRESENT:  Gabriel Haddad, Spanish Interpreter
               Carrie Lilley, Spanish Interpreter

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| BRIAN ESTEVEZ | | | | |
| By Mr. Pasricha | 4 | | | |
| By Mr. Bourbeau | | 41 | | |
| | | | | |
| JOSEPH MERRICK | | | | |
| By Mr. Pasricha | 43 | | | |
| | | | | |
| BRIAN ESTEVEZ | | | | |
| By Mr. Pasricha | 47 | | | |
| | | | | |
| STEVEN LAKEN | | | | |
| By Mr. Bourbeau | 57 | | 91 | |
| By Mr. MacKinlay | | 77 | | |

| EXHIBITS | FOR I.D. | IN EVIDENCE |
|---|---|---|
| D | 62 | |
| E | 64 | |
| F | 71 | |
| G | 72 | |
| H | 72 | |
| I | 95 | |
| 298 | | 4 |
| 299 and 300 | | 93 |

1                    TESTIMONY ONLY

2              THE CLERK:  All rise for the jury.

3          (JURORS ENTERED THE COURTROOM.)

4              THE COURT:  Good morning, everyone.  Mr. Pasricha.

5              MR. PASRICHA:  Thank you, your Honor.  Your Honor, the

6     government recalls Brian Estevez.

7              BRIAN ESTEVEZ, having been previously duly sworn by

8     the Clerk, testified as follows:

9                    <u>DIRECT EXAMINATION</u>

09:02AM 10    BY MR. PASRICHA:

11    Q.   Good morning, Trooper.

12    A.   Good morning, trooper.

13              MR. PASRICHA:  Your Honor, I'm going to have

14    Trooper Estevez read some more transcripts for us, but before

15    that, I have a stipulation.  This is introduced as Exhibit 298.

16              THE COURT:  I'm sorry, is it in evidence?

17              MR. PASRICHA:  I believe it was, if not, I'll move it

18    in right now.

19              MR. BOURBEAU:  No objection.

09:02AM 20    THE COURT:  It's admitted, 298.

21          (Exhibit No. 298 received into evidence.)

22              THE COURT:  Go ahead.

23              MR. PASRICHA:  Thank you, your Honor.  The

24    United States and Edwin Gonzalez agree and stipulate that the

25    following facts are true and not in dispute:

1          "On or about December 18th, 2015, Jose' Rivas

2     Renderos, also known as "Junior" went to a school police

3     officer at East Boston High School.  The school police officer

4     assigned to East Boston High School at that time was Gab Rosa

5     of the Boston School Police Department.  Gab Rosa did not write

6     a report of what Rivas Renderos said but called Detective

7     Donald Stone of the Boston Police Department."

8          "Detective Stone did not write a report of what

9     Rivas Renderos said but took Rivas Renderos to the Boston

09:03AM 10    Police Department the same day.  At the Boston Police

11    Department, Rivas Renderos was interviewed by Sergeant

12    Detective Richard Daley and Detective Stone with

13    Officer Ben De La Cruz assisting with translation.  Parts of

14    that interview were introduced into evidence and played for the

15    jury as Exhibit 297."

16         "During the interview, Rivas Renderos did not discuss,

17    nor was he asked about his previous conversation with School

18    Police Officer Gab Rosa."

19              THE COURT:  Okay.

09:03AM 20             MR. PASRICHA:  Thank you, your Honor.  Ladies and

21    gentlemen, if I can have you get your transcript binders as

22    well.

23    Q.   And, Trooper, do you have a binder with you?

24    A.   I do.

25    Q.   Can I have you first turn to Exhibit 203, please, and

1    page 4 of 203.  Towards the middle, CW-1 says:  "And what do

2    they call this dude," do you see that?

3    A.   I do.

4    Q.   Can we start there, please.  "And what do they call this

5    dude?"

6    A.   Demente:  "We named the guy Junior."

7    Q.   "Oh, this is Junior?"

8    A.   "Uh-huh."

9    Q.   "Check out his look."

09:04AM 10   A.   "Showing off."

11   Q.   "Showing off."

12   A.   "Son of a bitch."

13   Q.   "These kids look good, man."

14   A.   "Yes, this son of a bitch is a bit shy.  The little guy

15   that came over is feistier, man."

16   Q.   "That guy?  What do they call that guy?"

17   A.   "Gato."

18   Q.   "Oh, that's Gaito?"

19   A.   "Uh-huh, that guy, yes.  Son of a bitch, if you tell him

09:04AM 20   go get a culero, he will go by himself, that son of a bitch.

21   The other day the guy said, 'What's up, doggie?  There are two

22   guys here.  They look a bit strange.  What's the deal?'  He

23   asked me."

24   Q.   "Uh-huh."

25   A.   "There were five of them, right?"

1   Q.   "Yes."

2   A.   "'Should I hit them or not hit them,' he asked me."

3   Q.   "Uh-huh."

4   A.   "I told him, 'Follow them to see what the deal is,' right,

5   and then I told him, 'but the guy, (unintelligible) is already

6   up there.  He's up by White Street following those guys.'"

7   Q.   "Fuck."

8   A.   I told him, 'No, man, dude, go back.  Don't be an idiot.

9   How are you going to head up there?'  I told him, "'Hey, and it

09:05AM 10   turned that night they killed two guys.  Supposedly, they were

11   were a mess, but no one found out if they were a mess or not

12   because they didn't get any reports down there.'"

13   Q.   I'll stop there and have you turn to page 9, please.

14   Section 3 at the bottom, CW-1:

15        "So you weren't able to get that guy with the blow

16   from the machete?"

17   A.   Sangriento:  "No, man, dude, right there, I lunged at him

18   and fell, dude, and he got up right away, but the son of a

19   bitch is a boxer, man."

09:06AM 20   Q.   "What do you mean, boxer?"

21   A.   "Fuck, with this dude who was after the Everetts, dude,

22   that the son of a bitch went and cut his hands."

23   Q.   "For real, dude?"

24   A.   "Then the cops were making a big fuss.  They were looking

25   for people there.  When they inspected over there, they were

1    there from the window, they saw (unintelligible) the guys."

2    Q.   I'll pause and continue on page 12, please.

3         Towards the middle, Sangriento says:  "There are two

4    guys."

5         And CW-1 says:  "The cops.  Yes, and that guy that was

6    hacked up with the machete that day, man, what happened to that

7    son of a bitch?  Have you seen him again?"

8    A.   "That culero is around somewhere (unintelligible), in

9    other words, (unintelligible)."

09:06AM 10    Q.   "Huh?"

11    A.   "When something happens, one has to kill."

12    Q.   "Exactly."

13    A.   "And the guy (unintelligible) dude, the thing is that he's

14    scared, and there are a shit load of cameras,

15    (unintelligible)."

16    Q.   "They even installed cameras, right?"

17    A.   "At his house, they set up a camera."

18    Q.   "No way."

19    A.   "Yes, they put one on one side, one on the other, and one

09:07AM 20    above, dude, you know."

21    Q.   "You're kidding."

22    A.   Demente:  "They've set up security, the son of a bitch."

23         Sangriento:  "They have put cameras all along the

24    whole street, (unintelligible) cameras."

25    Q.   I'll stop there.

1          MR. PASRICHA:  If I can have everyone turn to

2     Exhibit 217 and page 20 of Exhibit 217.

3     Q.    Towards the middle after CW-1 says, "This is a one-way,"

4     and Gasper says, "Yes."  Do you see that, sir?

5     A.    Yes.

6     Q.    CW-1:  "Is Chuchito also going to get picked up?"

7     A.    Gasper:  "Chewy?"

8     Q.    "Yes.  But, honestly, will he be made a homeboy or will he

9     be jumped in as a chequeo?"

09:08AM 10    A.    "Look, the doggie, he was already a chequeo."

11    Q.    "Exactly.  Will he only be kicked in or will he be

12    promoted to homeboy?"

13    A.    "To homeboy, dog."

14    Q.    "Yes?"

15    A.    "Yes."

16    Q.    "Chuchito was given credit for the thing you guys did

17    there?"

18    A.    "Yes."

19    Q.    "Fuck.  I mean, cool then."

09:08AM 20    A.    "The thing is that doggie had already earned chequeo."

21    Q.    "Yes?  Well, that's good, doggie, yes, so Animal, doggie,

22    he only did that killing there."

23    A.    "Yes, but I think he's only going to be jumped in to

24    chequeo."

25    Q.    "Fuck, that guy is crude if they only make him chequeo,

1    doggie, I'm telling you because if they only make him chequeo,

2    no, man, he's going to resent it.  Mark my words, that dude

3    will leave them."

4    A.   "We'll see what happens, doggie, because the dudes had

5    planned to give him a double court, doggie, because he had

6    earned one and the other one for that stupid shit."

7    Q.   "Poor guy, he's so small, and they're going to throw the

8    gorillas at him."

9    A.   "Yes."

09:09AM 10   Q.   "What about your court?";

11   A.   Junior:  "Right now I was talking to Sangriento."

12   Q.   "Yes."

13   A.   Junior:  "He hadn't able to, homie, on Monday, he was

14   going to beat me. "

15   Q.   "Yes."

16   A.   Junior:  "Yes, but the thing is they killed a homie down

17   below."

18   Q.   "Uh-huh."

19   A.   Junior:  "So that why we weren't able to do it, dude,

09:09AM 20   because they said that no, that they couldn't (unintelligible)

21   that situation."

22   Q.   "No."

23   A.   "Since the dudes don't have off on the same days, at least

24   Sangriento is off only on Monday and Gato only Mondays and

25   Wednesdays, like that, you know."

1    Q.   "Yes, because I don't think many will beat you up, only

2    two or three."

3    A.   "Uh-huh, approximately.  Yes, about three will beat me

4    up."

5    Q.   "Yes."

6    A.   "But just it's a beating, no."

7    Q.   I'll stop there.

8         MR. PASRICHA:  If I can have everyone please turn to

9    Exhibit 207, please.  Actually, excuse me, ladies and

09:10AM 10   gentlemen, if I can have you first turn to 252, and, for the

11   record, this is an October 2nd, 2015 recording, and if I can

12   have everyone turn to page 6, please.

13   Q.   We'll start at that section with Animal at the top where

14   he says, "What clique do you belong to?"  Do you see that, sir?

15   A.   I do.

16   Q.   Can you please read that, and we'll start from there.

17   A.   Animal:  "What clique do you belong to, doggie?"

18   Q.   "I belong to the Eastsides."

19   A.   "The Eastsides."

09:11AM 20   Q.   "Uh-huh, I am Pelon of the Eastsides."

21   A.   "Uh-huh, yeah."

22   Q.   "Well, I have seen you, but I didn't -- I didn't."

23   A.   "Perhaps when I was a novice, I used to hang out around

24   those areas."

25   Q.   "And you are already a homeboy?"

1   A.   "The deal is that soon I'll be one, but I don't know when

2   the fuck they're going to give me my homeboy validation."

3   Q.   "Well, based on the little stunt you just pulled, it

4   should be a piece of cake.  Ask them once and for all, dude."

5   A.   "(Unintelligible)."

6   Q.   "Listen, I'm going to tell you in good faith, I'm a

7   homeboy, and you know what I mean, I'm from the Maras there,

8   and I'm going to tell you validation, my foot, no way, dude.

9   (Laughs.)  You know that when you hit the mark like you did

09:11AM 10   with that one, dude."

11   A.   "You know it."

12   Q.   "And, hey, you just did not take down any -- just any shit

13   head, any idiot."

14   A.   "No, sir, big rival gang member."

15   Q.   "A huge rival gang member.  I had already cracked his head

16   open, dude.  Didn't they tell you?"

17   A.   "Yes, man, the guy couldn't stand to see me."

18   Q.   "He couldn't stand to see you?"

19   A.   "He couldn't stand to see me because he would run away

09:12AM 20   from me."

21   Q.   "Because he knew that the beast would take him out, the

22   son of a bitch."

23   A.   "So the issue is that I had beaten that asshole already

24   several times, and he had never -- he had never been able to

25   stop me, dude."

1    Q.   "No fucking way."

2    A.   "He could never stop me, that asshole, and wherever he saw

3    me, he was scared shitless and ran away."

4    Q.   "Scooby and I, Snoopy and I, ask Snoopy, I gave him a

5    fucking beating with Snoopy."

6    A.   "That Scooby, they say that dude also had a good history,

7    the doggie I have."

8    Q.   "Yes, with me, ask that dude, I speak for that dude, man."

9    A.   "Well, yeah, we also have created havoc on the streets

09:12AM 10   with these young guys here.  I have also dealt with those

11   little guys, there, too.  I left them hanging by a thread."

12   Q.   "And how many -- how many times did you stab him?"

13   A.   "I stabbed the asshole three times, and it was a beautiful

14   thing, just beautiful."

15   Q.   "Beautiful."

16   A.   David:  "I have a knife here that's exactly the same as

17   his, dude."

18          Animal:  "The deal is that fucking guy."

19   Q.   "And where -- and where did you stab him, in the chest or

09:13AM 20   in the (unintelligible)?"

21   A.   Animal:  "The deal is that the first one, I stabbed him

22   right here, and he fell down dying, dude.  The guy was right

23   behind me when I got him.  Dude, I caught him, and he stood

24   there looking at my eyes and asked me if I was going to -- if I

25   was going to -- if I was going to kill him, if I was going to

1   stab him.  I told him, fucking, yes.  The Mara controls you,

2   rival asshole I said to him."

3   Q.   "And he still talked to you?"

4   A.   "Yeah, dude, the guy was there, knocked out cold, and he

5   stood right up again, and I was really surprised when he stood

6   up."

7   Q.   "You know that damn guy was strong because I once hit him

8   on the head really hard, and he stood up right again, too.

9   Imagine that."

09:14AM 10   A.   "Well, who knows what's up with him, but that asshole

11   stood right up and said to me, 'You're going to pay for this.'

12   He said that to me, and he crossed the street, but I knew that

13   with that fucking stabbing that I had -- what I had done to

14   him, I knew that he going to drop dead."

15   Q.   "You had already stabbed him in the back or not yet?"

16   A.   "The problem was, no, that's why I grabbed him."

17        David:   "He was already down."

18        Animal:   "I was leaving and screaming because he was

19   already down.  I was leaving and screaming thinking that the

09:14AM 20   dude was dead, man, and the guy stood right up."

21   Q.   "No fucking way.  And what did he say?"

22   A.   Animal:   "He told me you'll pay for this.  He said to me,

23   but he did not have the time to -- to say who the one that

24   broke him was, dude, because he died."

25   Q.   "What the fuck, didn't you go back to stab him more?"

1    A.   Animal:  "Uh-huh, but the problem is that there were some

2    women approaching, doggie, and you know that would have been a

3    problem."

4    Q.   "So the dam guy got right up, and he -- he -- he, after

5    you stabbed him, the son of a bitch stood up again?"

6    A.   "That asshole was going -- he ran a short distance, and he

7    fell down, and he fell down, right, so I caught him up to

8    again, and that's when I finished him off, man."

9    Q.   I'll pause there and have you turn to page 10, please.

09:15AM 10   All the way at the bottom where Animal says, "Yeah, until I

11   caught up to him."  Can you continue there, please.

12   A.   Animal:  "Yeah, until I caught up to him, and when he saw

13   that he couldn't get away and he was seeing that I was getting

14   closer to him, he stood up."

15   Q.   "He stood up to wait for you?"

16   A.   "Yeah, and he started throwing punches at me, but he was

17   not hitting me, and when he saw that he was not getting me, he

18   started running away, and I really stabbed him good.  I thought

19   the asshole would fall down dead, right."

09:16AM 20   Q.   "Fuck.  But what a strong fucking son of a bitch, huh, and

21   I landed there on him, and he looked like he was about to get

22   up, and he stared at me in the eyes, uh."

23   Q.   "But he didn't say anything to you then?"

24   A.   "And he said to me, 'Are you going to stab me?'  And I

25   said to him, 'Fucking, yeah, you rival.  The Maras control

1    you.'  That's what I told him.  (Laughs.)"

2    Q.    Stop there with that transcript.

3              MR. BOURBEAU:  Your Honor, may we approach briefly?

4              THE COURT:  All right.

5              (THE FOLLOWING OCCURRED AT SIDEBAR:)

6              MR. BOURBEAU:  Your Honor, this was one of the

7    transcripts that I had objected to because of the discussion

8    over the Animal kill, and the Animal, whether, Number 1, it's

9    not in furtherance, and, Number 2, the incident occurred before

09:17AM 10   any alleged involvement by Mr. Gonzalez, the incident with

11   Animal, and this is, again, I think the Court said the first

12   time that you'd let a little bit of this in.  I think this is

13   the transcript.

14             It goes much beyond a little bit, it goes into the

15   nature of the incident what goes on in the incident between

16   Animal and the cooperator, so I would move to strike this

17   aspect or that recording or what has been stated so far in this

18   transcript.

19             MR. PASRICHA:  I think that's what we were reading,

09:17AM 20   your Honor.  I think Animal is an indicted co-conspirator.

21   This is one of the murders in the case.  Further, there's been

22   some limited testimony from Gasper about the murder, and,

23   frankly, Junior, when he went to the police talked about the

24   two murders that Gasper, the Sangriento murder and the Animal

25   murder.

1            For all of those reasons, it does have some relevance

2    and the limited purposes, we've read and introduced we believe

3    are appropriate.

4            THE COURT:  It's relevant, and it's not prohibited by

5    Rule 403 otherwise, so I'll overrule the motion to strike.

6            (SIDEBAR CONFERENCE WAS CONCLUDED)

7            MR. PASRICHA:  Ladies and gentlemen, if I can have you

8    turn to Exhibit 207, please.  For the record, this is an

9    October 26th, 2015 recording.

09:18AM 10   Q.   And, Trooper, can I have you start right from the top.

11   CW-1:  "What's up, doggie?"

12   A.   Chuchito:  "What's up?"

13   Q.   "Fine, dog.  What else?"

14   A.   "Chilling."

15   Q.   "McDonald's there, do you want a hamburger?"

16   A.   "All right, dude."

17   Q.   "It's so far away over there, doggie, I looked it up in

18   the GPS."

19   A.   "It's 22 hours away, dude, that's what I got, too, dude."

09:18AM 20   Q.   "Yes, dude, but, dude, why do you want to take off all the

21   way over there because the --"

22   A.   "Over here, dude, I don't have a family close by here,

23   dude.  I don't have anyone that can lend me a hand, you know."

24   Q.   "But do you think if nobody is looking for you here, dude,

25   right now?"

1  A.   "Well, they are looking for me, doggie."

2  Q.   "You think so?"

3  A.   "Yes, doggie."

4  Q.   "But the cops aren't looking for you, dude."

5  A.   "It's not the cops looking for me but the FBI."

6  Q.   "No?"

7  A.   "Yes, they went to search for me two days ago."

8  Q.   "Where?"

9  A.   "At the house over there at the Tihawana, to pick me up

09:19AM 10  there."

11  Q.   "No way."

12  A.   "Yes."

13  Q.   "Wow."

14  A.   "That's why I want to leave, doggie.  What do you think?"

15  Q.   "But do they know that you did that hit on that son of a

16  bitch or what?"

17  A.   "No, the thing is that I don't know what's happening."

18  Q.   "Because?"

19  A.   "Because they told -- because they went to do -- they

09:19AM 20  even -- they went to look for me at my girlfriend's aunt's

21  place, dude."

22  Q.   "Uh-huh."

23  A.   "Those son of a bitches went all the way over there.

24  Dude, check out those detectives, look."

25  Q.   "You think they are detectives?"

1   A.   "Yes, and they went to look for me, dude, and they asked

2   me because I don't live with my girlfriend, doggie, she lives

3   with her mother, dude."

4   Q.   "Uh-huh."

5   A.   "And they showed up at my girlfriend's, too, dude."

6   Q.   "And they're from the FBI?"

7   A.   "The ones that showed at my house, yes, the ones that

8   showed up my girlfriend's were detectives, dude.  They were

9   asking her if she knew anything about me, if I cut my hair

10   differently or what, dude."

11   Q.   "Uh-huh."

12   A.   "Yes, like that, dude."

13   Q.   "But could they be from Chelsea or are they --"

14   A.   "No, the ones that showed up at my house, no.  Dude, my

15   brother told me that they were from the government, dude.  He

16   told me don't believe it.  If they are looking for you, he told

17   me, don't think that it's to put you in jail, he told me, it

18   must be a sentence that they want to give you because they're

19   not police or detectives, he told me, so, dude."

20   Q.   "No, look, don't believe much because those dam guys may

21   have, you know, evidence.  The culeros, you know, what happens,

22   the culeros probably -- maybe they suspect that it was you."

23   A.   "Yes."

24   Q.   "But they're not sure, dude."

25   A.   "Yes, that's the problem."

1   Q.   "Because you didn't leave anything, right, you didn't

2   leave the knife lying around over there, right, dude?"

3   A.   "Never.  The thing is that rival gang member that got

4   killed dude, well, I didn't participate in that one way there,

5   I had nothing to do with that."

6   Q.   "But the other one you did, right?"

7   A.   "Yes.  I went over there to get him on the scooter, dude."

8   Q.   "And the scooter, look, you already destroyed that

9   scooter, right?"

09:21AM 10   A.   "No, the guys painted the scooter and all that."

11   Q.   "Oh, good, cool."

12   A.   "But, dude, that scooter, that's another problem because

13   that scooter was taken from Gasper, dude."

14   Q.   "No, but if they had already painted it another color,

15   and --"

16   A.   "Yes, no, well, it was painted, dude, and --"

17   Q.   "Uh-huh."

18   A.   "But then the --"

19   Q.   "And did you leave any evidence on that fucking son of a

09:22AM 20   bitch, the shoes?"

21   A.   "Oh, well, that's the problem that I was telling the

22   dudes, dude, that when that son of a bitch jumped on the back,

23   dude, he kind of grabbed me, dude, because the guy wanted to

24   put his arms around me because the motorcycle didn't have

25   handles, dude."

```
 1    Q.    "Uh-huh."

 2    A.    "So then I told him, look, I told him, and I didn't mean

 3    to, but with my helmet on like, dude."

 4    Q.    "Uh-huh."

 5    A.    "So that I wouldn't have to show him my face like this,

 6    dude."

 7    Q.    "Uh-huh."

 8    A.    "I told him, and I kind of grabbed him, dude, and I told

 9    him, look, I told him put your feet here, I told him, because

10    the son of a bitch wanted to have them dangling."

11    Q.    "Uh-huh."

12    A.    "So I kind of grabbed him by the pants, I think, dude."

13    Q.    "But, no, but that would not -- but did you grab his

14    hand?"

15    A.    "No."

16    Q.    "No?"

17    A.    "That's a no."

18    Q.    "Oh, well, no, dude, because the problem would be if I

19    sort of grabbed your hand like this --"

20    A.    "Yes."

21    Q.    "-- And we moved it like this --"

22    A.    "Yes."

23    Q.    "-- and when you stabbed him?"

24    A.    "No, when I stabbed him, dude, with the --"

25    Q.    "But you didn't leave the knife there, right?"
```

1    A.    "No, dude, I left the tip there, dude, I left it thrown

2    down there because it broke when I grabbed him."

3    Q.    "But --"

4    A.    "But I grabbed it with the rag, dude, well, and the knife,

5    dude, they tossed it on the beach, dude."

6    Q.    "Oh, well, no, no, no, no, because --"

7    A.    "Over that way."

8    Q.    "I hadn't talked to you about that because I, you know, I

9    listen, dude, I'm a tiger.  I'm telling you, I find out about

09:23AM 10    everything, you know."

11    A.    "Yes."

12    Q.    "How things are happening.  I'm going to tell you how I

13    see the problem.  The fucking thing is, look, your shoes.  Did

14    you leave a shoe behind?"

15    A.    "No."

16    Q.    "Because sometimes when you do something, you lose a shoe,

17    and one can get caught because of a shoe."

18    A.    "No, not me, dude."

19    Q.    "No?"

09:23AM 20    A.    "Because I came back over here to East Boston to get

21    changed, dude.  Yes, dude, I changed my clothes and all that

22    shit."

23    Q.    "And the scooter, is it --"

24    A.    "Dude, the scooter was that -- that's why I don't think

25    that's it because of the scooter, you know, doggie."

```
 1    Q.    "No, no."

 2    A.    "Because the scooter, dude, I lost the sticker, dude, and

 3    by the time they took it, it already had a different one."

 4    Q.    "Uh-huh.  Oh, well, no."

 5    A.    "Yes."

 6    Q.    "No, so then there isn't any evidence, man, because if

 7    there were evidence, dude, I swear like this, hey, dude, they

 8    would go pick you up like this because it's a killing."

 9    A.    "Yes."

10    Q.    "It's not just a small thing, dude."

11    A.    "Yes."

12    Q.    "I didn't want to ask you, but, you know, I thought if

13    this dude grabbed him, you know, if you held him."

14    A.    "Yes."

15    Q.    "If you weren't wearing gloves, dude, and grabbed him and

16    stabbed him --"

17    A.    "No, then, yes, no, dude, we all --"

18    Q.    "If you only stabbed and --"

19    A.    "We use handkerchiefs, dude, because --"

20    Q.    "Uh-huh."

21    A.    "Sangri from the Molinos, dude --"

22    Q.    "Uh-huh."

23    A.    "-- he started, dude."

24    Q.    "Yeah, that's what the dude told me."

25    A.    "Yes, and then, you know, dude, he told me, go, ChuChu,
```

1    it's your turn.  Awesome, grab it, and he wrapped it up for me,

2    dude."

3    Q.    "Uh-huh."

4    A.    "He wrapped it up and gave it to me."

5    Q.    "And had they already knocked out the dam dude to the

6    ground?"

7    A.    "Yes."

8    Q.    "Oh, well."

9    A.    "But the doggie wanted me to participate as well."

09:25AM 10    Q.    "Yes, for you to wet?"

11    A.    "Uh-huh."

12    Q.    "So that he would know so that he could see how you are?"

13    A.    "Yes.  So then, yes, I grabbed it, and straight away,

14    dude, that's the problem, dude, you know, but who knows why

15    those son of bitches are looking for me?"

16    Q.    "No, dude, the thing is, look, dude, I'll tell you that

17    the culeros, since you've gone to school, the mistake is that

18    you're hiding, man."

19    A.    "Yes, I mean, yes.  No, it's not that I'm hiding from them

09:25AM 20    dude, but --"

21    Q.    "You have to go past the culeros, man, so that they see

22    you."

23    A.    "Yes."

24    Q.    "Look, I'm going to tell you what the technique is like so

25    that they will believe that you are here, dude, and that you

1    are not fleeing, go by them.  Don't let yourself get caught by

2    the police."

3    A.   "Yes."

4    Q.   "Because the cops are just going to interrogate you,

5    they're going to ask you, hey, did you go there, this and that,

6    where were you that day, who were you with.  They're going to

7    ask you all that, so you need to coordinate with your

8    girlfriend, dude."

9    A.   "Yes."

09:26AM 10   Q.   "Are you fighting with her?  No.  You don't want that girl

11   to snitch on you."

12   A.   "No, dude, I left my girl pregnant over there, dude."

13   Q.   "All right, man, so then, you know, coordinate with her

14   that you were there with her that day and somebody else."

15   A.   "Oh, no, but the problem, doggie, is that the girl, dude,

16   can't be included in that, doggie."

17   Q.   "Yes?"

18   A.   "Uh-huh."

19   Q.   There's some ellipsis, moving on.

09:26AM 20        "I wanted to ask you, dude, if you know."

21   A.   "Because the problem with the girl, doggie, I'll tell you

22   that that girl, the sons of bitches have asked her as well,

23   dude, you know how detectives are."

24   Q.   "Yes, but they're not going to find anything to her."

25   A.   "Yes, so then they asked her, dude, if she knew anything

1   about me."

2   Q.   "Uh-huh."

3   A.   "She said no, that ever since we had separated, she has

4   not seen me again and that she had no communication with me."

5   Q.   "Awesome."

6   A.   "That she didn't even have a cell phone.  She does have

7   one dude but she hid it that day."

8   Q.   "Well --"

9   A.   "And like that, dude, so you know if the girl comes now

09:27AM 10   and in that problem I tell you --" excuse me, "and in that

11   problem I tell them that I was with the girl."

12   Q.   "No, find another girl that was with you.  Use --"

13   A.   "Yes."

14   Q.   "What's her name?  Wendy, use Wendy."

15   A.   "They say that that girl is locked up, dude."

16   Q.   "That dude is locked up?"

17   A.   "Yes."

18   Q.   "Why?"

19   A.   "Who knows, dude.  I don't know what happened with the

09:27AM 20   girl, but they arrested her, dude."

21   Q.   "Well, get a bitch that doesn't know anything or get

22   another girl that you know like Sleepy or -- no, but that girl

23   isn't trustworthy."

24   A.   "No, you know."

25   Q.   "Another girl, dude, that can do that favor for you that

1    will say that she had been having sex with you that day, that

2    she was with you, you know, all night."

3    A.    "Yes.  But another thing that I don't know, doggie,

4    because that culero that survived saw me, dude."

5    Q.    "The culero that --" oh, sorry, excuse me.  "Oh."

6    A.    "That culero that -- because there were two culeros,

7    doggie, and the other culero that got away from the two boys

8    saw me, dude, because the two were going to take him, but the

9    son of a bitch ran from them and went into a laundromat over

09:28AM 10    there at Trenton."

11    Q.    "Oh, the one Animalito killed?"

12    A.    "Yes.  There was another culero with that guy."

13    Q.    "Yes, but don't think that it's because of that dude

14    because if they already they saw -- that culero knows that you

15    were there but that you didn't hit him, dude."

16    A.    "Yes."

17    Q.    "And here they'll grab -- do you want a sandwich, what

18    kind of do you want?"

19    A.    "Well, anything."

09:28AM 20    Q.    "Yes, dude."

21    A.    "Yes, I'm telling you."

22    Q.    "But look, dude, I'm going to give you some advice.  What

23    you should do is to get a room here.  Don't leave, dude,

24    because if you leave, you're going to bring all the blame upon

25    yourself, dude."

1   A.   "Yes."

2   Q.   "You know, they messed up by taking Animalito away from

3   here, man.   I haven't talked to Crazy about that, but I know

4   that's happening."   Then they appear to order food.

5   A.   "Well, yes, dude."

6   Q.   "Yes, doggie, and trip over there is tough, dude."

7   A.   "That trip, yes, it's a little long."

8   Q.   "It's a fucking bunch of money to go all the way over

9   there."

09:29AM 10   A.   "Yes."

11   Q.   "No, dude, if you're fucked up now, you're not even

12   working right now, or are you?"

13   A.   "Yes, dude, I'm working."

14   Q.   "Look, what you should do, dude, this is my advice, get a

15   room, dude.   Get a room, dude, get out of that house or get a

16   room or right there.   If they're not kicking you out, man, stay

17   there, man, don't leave.   That's what I'm telling you.   Hey,

18   dude, the dudes may tell you, hey, leave, dude, leave because

19   they're looking for you.   The problem is that you don't get a

09:29AM 20   beating, man, and don't be out on the street."

21   A.   "No, no, I'm not out on the street, dude."

22   Q.   "Okay."

23   A.   "I go from my house to work, dude.   Sometimes we go

24   together with Psycho, dude, because he's from the side, dude,

25   or if not, we take a taxi to go up there, dude."

1    Q.   "Exactly, dude.  So when you have something like that,

2    it's better that you go to Everett or some other place, dude.

3    Call, and I'll take you, dude."

4    A.   "Exactly, dude."

5    Q.   "Exactly, dude."

6    A.   "Yes, I haven't even gone out today, dude."

7    Q.   "No."

8    A.   "Look, I don't even know what it's like to walk these

9    fucking streets today, dude, no."

09:30AM 10    Q.   "3, 4, 5, 6, 7, 8, 9, 10, 11, 12, uh-huh, but don't leave,

11    man, I'm telling you because you're going to -- you tell me,

12    dude, if they show up over there supposing they know what's up

13    with you, you know, they already know your name.  If they went

14    looking for you, it's because they know your name."

15    A.   "Yes."

16    Q.   "Okay, man.  They don't have evidence because if they had

17    evidence, dude, they would have already put up a poster."

18    A.   "But, yes, dude, yes, dude, they told Gigi's aunt that

19    they were looking for me for something serious, dude."

09:31AM 20    Q.   "It's to talk to you."

21    A.   "No, doggie, because I already talked to the ones from

22    State Police, dude, when they went looking for me the first

23    time."

24    Q.   "Yes."

25    A.   "I presented myself over here in East Boston, dude, didn't

1    you hear about it?"

2    Q.   "No."

3    A.   "I came here on my own."

4    Q.   "That's a mistake you made, dude.  Never do that."

5    A.   "So then what?  Over there in Miami?"

6    Q.   "Oh, I thought uhm -- I thought that the son of a bitch

7    that got killed had seen you, the guy?"

8    A.   "No."

9    Q.   "I thought the son of a bitch was still alive, dude."

09:31AM 10    A.   "No, no, that son of a bitch, dude, the next day we saw it

11    on the news, it was a holiday, dude."

12    Q.   "Exactly, dude, with that son of a bitch, you guys had a

13    really good time, dude."

14    A.   "Yes."

15    Q.   "It sounds like that culero was fierce is what they say?"

16    A.   "Uh-huh."

17    Q.   "What's his name, Demente, said that the son of a bitch is

18    fierce?"

19    A.   "He is, yes."

09:31AM 20    Q.   "He hit him hard, too, they said?"

21    A.   "Which one, Demente?"

22    Q.   "Huh?  What's his name?"

23    A.   "It's Sangriento."

24    Q.   "Sangriento, exactly."

25    A.   "Oh, yes, that son of a bitch started it, dude."

1    Q.   "Yes?"

2    A.   "Yes."

3    Q.   "First Gasper, he left, he gave me a swift kick in the

4    face, dude."

5    Q.   "He gave him a swift kick in the face," correct?

6    A.   "He gave him a swift kick in the face, dude."

7    Q.   "Awesome, dude, I thought.  I was scared.  I thought that

8    you had left evidence behind, dude."

9    A.   "No, dude."

09:32AM 10    Q.   "If you didn't leave any evidence, then there's no problem

11    because I was thinking that this Chuchito leave his shoe

12    because if you leave a shoe, then, yes.  If you left a knife

13    that you stabbed him with, dude."

14    A.   "Yes, but, no, nothing, dude."

15    Q.   "You didn't leave anything?"

16    A.   "Nothing, dude."

17    Q.   We'll stop there.  A few questions for you,

18    Trooper Estevez.  At some point in January, 2016, are you aware

19    that the defendant was arrested?

09:33AM 20    A.   Yes.

21    Q.   Were you involved in the broader investigation at that

22    point?

23    A.   Yes.

24    Q.   Did you -- are you aware if the defendant was booked

25    following his arrest?

```
 1    A.    Yes.

 2    Q.    Did you review the booking information of the defendant?

 3    A.    Yes.

 4    Q.    Do you recall if the defendant, if there was a middle name

 5    of the defendant or what his full name was when he was booked

 6    following his arrest?

 7    A.    Yes, I believe it was Edwin Andres Gonzalez.

 8    Q.    And do you have a recollection of the spelling of his

 9    middle name, "Andres"?

10    A.    A-n-d-r-e-s.

11    Q.    Okay.  Then I want to turn your attention to December 6th,

12    2015.  Do you recall that date, sir?

13    A.    I do.

14    Q.    Were you part of the investigation on that date?

15    A.    Yes.

16    Q.    Did you receive certain information from your source, CW-1

17    or Pelon?

18    A.    I did.

19    Q.    What did CW-1 tell you on December 6th, 2015?

20    A.    He advised that several MS-13 members, a few leaders were

21    getting together, and they were going to do a beating or a

22    promotion ceremony for Sangriento.

23    Q.    Did he tell you where that ceremony would be?

24    A.    Yes, he said they were going to drive to Winthrop, to Deer

25    Island.
```

09:33AM (line 10)
09:34AM (line 20)

Q.   As a result of receiving that information, what, if

anything, did the task force do?

A.   At the time, I contacted the North Shore Gang Task Force,

and we set up surveillance on the Chelsea Street address,

214 Chelsea Street, the time where we knew some of the Molinos

members lived, including Demente and Sangriento.

     I also then contacted the Massachusetts State Police

CAT team or the Community Action team, it's a uniformed patrol,

but their sole focus is to conduct motor vehicle stops and

things of that nature and special requests, things like that,

so I contacted --

Q.   Let me pause you right there.  Did you, yourself, and

members of the task force go to that Chelsea Street address for

the purpose of conducting surveillance?

A.   Yes.

Q.   Where did you instruct the CAT team to respond to?

A.   I had them go directly to Winthrop, Taft Avenue, which is

the one road that leads into Deer Island.  It's a one-way

street coming in, and it's a two-way coming out, so I had them

set up inside the neighborhood prior to the entrance to Deer

Island and to wait there as these individuals went in and then

came out.

Q.   And what was the plan that day in order to try confirming

the identities of any persons who may go to Deer Island?

A.   So once we followed them to Deer Island, I advised them

1    that as they came out, I asked the CAT team to stop the

2    vehicles and conduct an FIO of them and identify them and take

3    pictures of them.

4    Q.   What is an FIO?

5    A.   Field interrogation observation report.  It's just usually

6    what we do is ask questions, gather personal information about

7    the individual, name, date of birth, address and photograph

8    them.

9    Q.   I'm showing you what's been admitted --

09:36AM 10         MR. PASRICHA:  Madam Clerk, can I have the document

11   camera, please.

12   Q.   I'm showing you what's been admitted as Exhibit 253.2.  Do

13   you recognize this, sir?

14   A.   I do.

15   Q.   What is this a map of?

16   A.   Winthrop and the Deer Island area, the Deer Island Park

17   area.

18   Q.   And is this the park area where the task force performed

19   surveillance of individuals who were headed there?

09:37AM 20   A.   Yeah, so the part on the bottom of the screen, it's the

21   water treatment plant.

22   Q.   Circle on the screen if you want to highlight areas you're

23   talking about.

24   A.   So here's the water treatment plant and this part here is

25   the actual Deer Island Park.

Q.   And after the stop was made by the CAT team, do you have an understanding as to where the stop was made, approximately?

A.   Yes, it was on the outbound road leaving the park.  Could you zoom?

Q.   Sure.

A.   So approximately in this area here.

Q.   Okay.  In addition to the surveillance that the task force was performing, was CW-1's vehicle equipped with recording equipment at that time?

A.   His vehicle was equipped with audio and video recording equipment, yes.

Q.   And separately was he also equipped with a recording device on his person?

A.   Yes, we had equipped him that evening with a personal recording device that recorded audio and video.

Q.   Speaking of Deer Island, during the course of this investigation, did you have any other occasion to go to Deer Island with CW-1?

A.   Yes.

Q.   When was that?

A.   In January.

Q.   And in January, what happened or what was the cause of you going to Deer Island?

A.   CW-1 had contacted me and advised that he and several other MS-13 members had discarded or attempted to hide evidence

1    of a homicide that had occurred.

2    Q.    Did you go with CW-1 personally to Deer Island that day?

3    A.    Yes, after they cleared the area, I went with him and

4    other agents and officers of the task force, and we walked to

5    Deer Island Park, and he pointed out exactly where they had

6    buried the items.

7    Q.    What did you observe him to do?

8    A.    I walked with him.  He led the way, and at some point, I

9    don't know exactly what the distance from the parking lot to

09:39AM 10    where we stopped, but he pointed and said that's where they

11    buried it, that's where we buried it.

12         MR. PASRICHA:  Turning back to the events of

13    December 6th, if I can have everyone, please, turn to

14    Exhibit 221, which is a transcript of a December 6th, 2015

15    recording and page 3.

16    Q.    Towards the middle, do you see CW-1 say yes, "But it's

17    cold over there, man?"

18    A.    Yes.

19    Q.    "Yes, but it's cold over there, man?"

09:40AM 20    A.    Sangriento:  "Huh?"

21    Q.    "It's going to be cold over there."

22    A.    Siniestro:  "It's cold over there, and I don't have my

23    sweater."

24    Q.    "And, me, I will take my mask (unintelligible.)"

25    A.    Sangriento:  "And outside, they say it's going to be

1    outdoors."

2    Q.    "Oh, yeah."

3    A.    Siniestro:  "They say it's going to be in a park."

4         Sangriento:  "And I'm going to take off my jacket

5    again."

6    Q.    "No, man, why are you going to take it off?"

7    A.    Sangriento:  "Huh?"

8         Siniestro:  "Just one, just take one off."

9    Q.    "No, man, just one and --"

09:41AM 10    A.    Sangriento:  "No, man I'm going to take it."

11    Q.    "Ah, and let me tell you something and do this because I

12    think a lot of guys are going to hit you.  Be wise.  I am going

13    to tell you something.  Look, dude, protect your head and try

14    to duck.  Don't try to get up and jump like this because they

15    are only going to give you a single blow for you to fall to the

16    floor.  If you fall, dude, get up quickly because the kicks

17    will follow."

18    A.    Sangriento:  "But you can't get up."

19    Q.    "No, no, buddy, get down on all fours quickly, dude, and

09:41AM 20    always covering up here.  Look, like this, with this, like

21    that.  Cover up your face and your ribs here because a blow

22    here, dude, will knock you out with the --"

23    A.    Siniestro:  "With Demente, dude, he reserves everything

24    for the end, and at the end, after 12 have past through, stand

25    up firmly, son of a bitch, because you're going to get a

1   beating, man, blows are going to reign on you, man, you're

2   going to get..."

3        Sangriento:  "And about how many will be there, dude?"

4   Q.   "Huh?"

5   A.   Sangriento:  "About 12?"

6        Siniestro:  "I think it's about 15."

7   Q.   "No, no, I don't think that many."

8   A.   Siniestro:  "It's around 15, dog, I think."

9        Sangriento:  "I heard that there are several."

09:42AM 10   Q.   "Yes, but, no, no, -- well, it's only -- I don't know

11   what's up, but you have to -- legally, I think it's seven that

12   have to come upon you altogether, but I don't know how you all

13   do it around here, but, no, what I have done is take off your

14   cap, take off your jacket and square up like this and only hold

15   them like this, look, like this, like this, don't let them put

16   up --"

17   A.   "But when I'm over there, will it be light there, or is it

18   going to be dark?"

19   Q.   "No, it's a small mountain.  It's dark."

09:42AM 20   A.   Sangriento:  "Those sons of bitches are not going to hit

21   me in the face, dude?"

22   Q.   "That's where the shit is, dude, not they are free then."

23   A.   Sangriento:  "Well, yes, but (unintelligible)."

24   Q.   "I don't know what the deal is, but your rules are because

25   we --"

```
 1    A.    Sangriento:  "No, man, you can't hit in the face."

 2    Q.    "No, that's why.  Don't let your guard, dude, that all

 3    happens.  Where is that dude then?"

 4    Q.    Sangriento:  "I don't know, dude.  Let me call him again."

 5    A.    Siniestro:  "Has Demente called you?"

 6              Sangriento:  "Uh-huh, yes."

 7              Siniestro:  "Is that Demente?  (Unintelligible.)  That

 8    due is going to fuck him over."

 9    Q.    "Well, I'm going to call him.  Hold on."

10    A.    Siniestro:  "What the fuck, tell him."

11    Q.    "(Unintelligible.) I am here outside the --"

12    A.    Siniestro:  "We are here with Siniestro as well."

13              Sangriento:  "Ugh, no, man, I have to talk with Flaco,

14    and the guy was arguing (unintelligible) for me to change

15    nicknames."

16    Q.    "Huh?"

17    A.    "(Unintelligible)"

18    Q.    "No, man, your nickname is fine, so don't fuck around."

19    A.    Siniestro:  "If you don't want, don't."

20    Q.    "No, man, if you don't want, they can't change it for you,

21    no."

22    A.    Sangriento:  "No, I asked the dude, and he said it's fine

23    like that."

24              Framenti:  "They didn't tell me that.  He told me that

25    I had earned it, and was --"
```

```
 1   Q.   "No, dude."

 2   A.   Sangriento:  "(Unintelligible) and that it was available

 3   in the barrio."

 4   Q.   "Yes, dude, but keep it there.  Fuck, Sangriento, that's a

 5   fucking nickname, I'm telling you.  It's been some time since I

 6   had heard it, doggie."

 7   A.   Sangriento:  "Why (unintelligible) heard?"

 8   Q.   "Listen, chuckles, no.  Well, yes, there are two that --"

 9   A.   Siniestro:  "Yes, man, Sangriento, a fucking blood

10   drenching one that will leave you named clearly."

11   Q.   "That's why, doggie.  That is a good nickname."

12   A.   Siniestro:  "You like make trouble, man."

13        Sangriento:  "No, man, don't say.";

14        Siniestro:  "No, but that is also his decision, fool,

15   so don't."

16   Q.   "That's right, if you don't like it, they're going to give

17   you one that --"

18   A.   Siniestro:  "And me, down there, dude."

19        Sangriento:  "Me, the -- the killer.  Chuckles."

20   Q.   I'll have you stop there.  Page 7.  Towards the top,

21   Siniestro:  "And so Demente is on his way then?"

22   A.   Sangriento:  "He's coming (unintelligible)."

23        Demente (on the phone):  "(Unintelligible).  What's

24   up?"

25   Q.   "Where are you dude?  Come over here."
```

1    A.    Demente:  "I'm here now."

2          "You're parked there in front of my house?"

3    Q.    I'll pause there.  Is this the house on December 6th where

4    you had surveillance where you indicated that both Demente and

5    Sangriento lived?

6    A.    Yes.

7          MR. PASRICHA:  No further questions for this witness

8    at this time, your Honor.

9          THE COURT:  Cross.

09:46AM 10                    CROSS-EXAMINATION

11   BY MR. BOURBEAU:

12   Q.    Good morning, Trooper Estevez.

13   A.    Good morning, sir.

14   Q.    Were you present at an interview of Mr. Rivas Renderos

15   also known as "Junior" on January 17th, 2016?

16   A.    I don't know.

17   Q.    Well --

18   A.    I don't remember the date.  I have interviewed him in the

19   past.

09:46AM 20   Q.    You're familiar with the individual known as Junior?

21   A.    Yes.

22         MR. BOURBEAU:  May I just approach?

23   Q.    After reviewing your January 17th, 2016 report, does that

24   refresh your recollection?

25   A.    Yes, I interviewed him, and I did write a report on that

1    date.

2    Q.    And specifically did Junior tell you that even though he

3    hadn't officially declared himself as a paro, he was treated

4    like one and stated that he was jumped in by MS members?

5    A.    Yes.

6    Q.    Now, moments ago you talked about Mr. Gonzalez being

7    booked and that his middle name was Andres?

8    A.    Yes.

9    Q.    Or at least that was written on the booking sheet?

09:48AM 10    A.    Correct.

11    Q.    But there's a number of Andres throughout this

12    investigation, were there not?

13    A.    Yes.

14    Q.    There was Andres, the Columbian; Andres Salvador;

15    Jose' Andres; there's a whole lot off Andres?

16    A.    There's a few.

17    Q.    Right?  It's a very common name?

18          THE COURT:  You have to answer audibly.

19    A.    Yes.

09:48AM 20    Q.    And Sangriento wasn't referred as Andres during the

21    investigation?

22    A.    By whom?

23    Q.    Well, other than -- during the recordings that you

24    participated or listened to, he was not referred to as Andres,

25    was he?

```
 1    A.    No.
 2              MR. BOURBEAU:  Thank you, I have nothing further.
 3              THE COURT:  Redirect.
 4              MR. PASRICHA:  No, your Honor, not at this time, but
 5    we'll probably call Trooper Estevez back in about five minutes.
 6    We have another witness.  Thank you.  The government calls
 7    Joseph Merrick.
 8              JOSEPH MERRICK, having been duly sworn by the Clerk,
 9    testified as follows:
10                         DIRECT EXAMINATION
11    BY MR. PASRICHA:
12    Q.    Good morning, sir.
13    A.    Good morning.
14    Q.    What is your name?
15    A.    Joseph Merrick.
16    Q.    Where do you work?
17    A.    Massachusetts State Police.
18    Q.    How long have you been with the State Police?
19    A.    Six and a half years.
20    Q.    What's your title?
21    A.    Trooper.
22    Q.    How long have you been a trooper?
23    A.    Six and a half.
24    Q.    I want to turn your attention to December, 2015.  Were you
25    assigned to any special unit within the State Police on that
```

1   day?

2   A.    I was, I was assigned to the Community Action Team.

3   Q.    What is the Community Action Team?

4   A.    It's a unit made of 10 to 12 troopers, one sergeant, and

5   we're assigned to high crime areas to patrol.

6   Q.    Do you also support other members of the State Police or

7   task force when called upon?

8   A.    We do, when needed, yes.

9   Q.    I want to turn your attention to December 6th, 2015.  Were

09:51AM 10   you called upon to provide certain assistance?

11   A.    Yes.

12   Q.    Where were you asked to go?

13   A.    We were asked to hang around the Deer Island area in

14   Winthrop.

15   Q.    And what were you asked to do?

16   A.    We were asked to make a motor vehicle stop.

17   Q.    Were you with another trooper that day?

18   A.    I was.

19   Q.    With who?

09:51AM 20   A.    Trooper David Strong.

21   Q.    Did you make a motor vehicle stop of vehicles that day?

22   A.    Yes.

23   Q.    Were they coming in or going out of Deer Island?

24   A.    They were leaving Deer Island.

25   Q.    How many vehicles got stopped by the State Police that

1    day?

2    A.    Three.

3    Q.    The first vehicle that you stopped, did you -- once you

4    stopped the vehicle, did you ask the occupants to exit the

5    vehicle?

6    A.    Yes.

7    Q.    Did you ask the occupants to identify themselves once they

8    exited the vehicle?

9    A.    Yes.

09:52AM 10    Q.    Do you recall the names of any of the individuals you

11    stopped that day?

12    A.    I do.

13    Q.    What is one of the names you remember?

14    A.    Edwin Gonzalez.

15    Q.    When the individuals exited the vehicle, did you also

16    photograph them?

17    A.    That's correct, we did.

18    Q.    Did you also photograph the individual who identified

19    himself as Edwin Gonzalez?

09:52AM 20    A.    Yes.

21    Q.    What did you do with that photograph after?

22    A.    I turned all the photographs and information over to

23    Brian Estevez.

24    Q.    In preparation for your testimony, did you review a

25    recording of a December 16th, 2015 recording?

1    A.    Yes.

2    Q.    You reviewed both the recording and a transcript of the

3    recording?

4    A.    Correct.

5    Q.    There were two police officers noted on the transcript.

6    Do you recall that?

7    A.    I do.

8    Q.    Did you recognize any of the voices on that recording?

9    A.    Yes.

09:53AM 10    Q.    Who did you recognize?

11    A.    I recognized my voice and Trooper David Strong.

12    Q.    Did you overhear the interactions of that day, including

13    when individuals were being asked their name?

14    A.    Yes.

15    Q.    And did you hear the part where the individual you stopped

16    or one of the individuals identified himself as Edwin Gonzalez?

17    A.    Yes, I did.

18            MR. PASRICHA:  Nothing further.

19            MR. BOURBEAU:  No questions.

09:53AM 20            THE COURT:  Thank you.  You may step down.

21            THE WITNESS:  Thank you.

22            MR. PASRICHA:  Your Honor, we'll recall Brian Estevez

23    to read one more transcript.

24            THE COURT:  All right.  We'll re-swear you because

25    that's what we've been doing.

1          BRIAN ESTEVEZ, having been duly sworn by the Clerk,

2    testified as follows:

3                          DIRECT EXAMINATION

4    BY MR. PASRICHA:

5    Q.    Trooper, before I ask you to read that transcript, I'd

6    like to show you two exhibits, please.  I'm showing you

7    Exhibit 289, which was the stipulation regarding certain

8    phones.

9          There's a stipulation regarding certain phones,

09:54AM 10   including the phones of Edwin Gonzalez, a/k/a "Sangriento."

11   Can you please read into the record 2B, what was the phone

12   number assigned to the phone of Edwin Gonzalez?

13   A.    617-749-7434.

14   Q.    In addition to Edwin Gonzalez' phone, you also reviewed

15   certain extracts from the phone of Jairo Perez, a/k/a "Seco,"

16   correct?

17   A.    Yes.

18   Q.    I want to show you 268.2, the contact list.  I believe you

19   testified about this previously, but I don't believe I showed

09:55AM 20   you this page.  What subsection of Seco's phone is 268.2?

21   A.    The contact list.

22   Q.    Can you read into the record, please, contact at entry 52

23   first.  What is the phone number saved in that contact?

24   A.    617-749-7434.

25   Q.    And what is the name that's saved under?

1    A.    Andres S.

2    Q.    Thank you.  If you can pull out our binder again, please.

3    Continuing on with Exhibit 221, page 11, please.  Do you see

4    the section at the top where Sangriento says on the phone,

5    "Flaco from East Boston"?

6    A.    On which page?

7    Q.    Sorry, page 11 of 221.

8    A.    Sorry.  Okay.  Yeah.

9          Sangriento:  (On the phone) "Flaco from East Boston

09:56AM 10    is."

11          Siniestro:  (On the phone) "What was that, man?"

12          Sangriento:  "The ones that are going to beat me,

13    Flaco from East Boston."

14          Siniestro:  "Hello."

15          Sangriento:  "Is going to come."

16          Siniestro:  "What did you say?"

17          Sangriento:  "This dude, Lagrima, from the clique, and

18    there are some dudes from Everett, and we (unintelligible)."

19          Siniestro:  "Yes, there is a car, dude.  We are

09:57AM 20    watching it right now, understand.  Several of us dudes came,

21    dude.  We brought ah -- we brought along three cars, you can

22    imagine."

23          Sangriento:  "(Unintelligible)."

24          MR. PASRICHA:  Before I just continue, Madam Clerk,

25    can I have you please turn the computer back on.  We'll also

1    have it scrolling on the screen.  Thank you.

2    Q.    CW-1:  "Let's have one small group walk first and then

3    another group."

4    A.    Siniestro:  "Uh-huh."

5          Sangriento:  "Pelon, that dude from the Eastsides."

6          Siniestro:  "That dude must already know.  That's the

7    serious part."  "We don't have -- no, man, to have to walk."

8    A.    Sangriento:  "What?"

9    Q.    "All right.  We'll talk."  Sorry, that's Siniestro.

09:58AM 10    A.    Siniestro:  "We'll talk later, man.  I'll send you a

11    message to let you know how things are, and I can go by there,

12    man."

13          Sangriento:  "Of course, but what happened is that

14    ones in the program told Demente."

15          Siniestro:  "Fine, then, man, all right, then, man,

16    all right then, son of a bitch."

17          Sangriento:  "Uh-huh.  They told him because of that."

18          Siniestro.  "You got it then."

19          Sangriento:  "It's better because the son of a bitch

09:58AM 20    is retarded, dude, and he can break my ribs."

21          Siniestro:  "You got it, uh-huh."

22    Q.    "What's up?  Let's have a small group.  Do we give him a

23    small group?"

24    A.    Siniestro:  "Talk to Demente there."

25    Q.    "I don't know."

1    A.   "All right then, son of a bitch, right on."

2         Sangriento:  "Tomorrow we have to ask that dude if

3    we're going to give him (unintelligible) and see what happens."

4    Q.   "Uhm, it's cold up there today."

5    A.   Sangriento:  "What's up?"

6         Siniestro:  "He'll be here shortly, and what's the

7    problem with that car?"

8         Sangriento:  "Hello."

9    Q.   "No, man, they stand here to fish, man."

09:59AM 10   A.   Sangriento:  "Hold on, hold on, dude, what's up?"

11   Q.   "We came here with Chucho the last time."

12   A.   Sangriento:  "What's up?  What's up?"

13   Q.   "The parking lot is cold, doggie."

14   A.   Sangriento:  "No, man, it's Lagrima on the line, dude.

15   What's up, Lagrima?  What's up?  Agh, uh-huh, so then have

16   Street Danger stay here.  All right.  No sweat then, dude, and

17   then for him to stay by himself with Pelon, right?  All right.

18   Then there is no problem with Pelon."

19        Siniestro:  "No, man, he also has to go because he's

09:59AM 20   going to (unintelligible), man."

21        Sangriento:  "Ugh, well, then, no, all right then, so

22   then there's no problem, no problem, he was up there in front."

23   Q.   "Lend me your shoes, man."

24   A.   Siniestro:  "Let me go get him to tell him."

25        Sangriento:  "Look, (unintelligible)."

1    Q.   An unidentified male says no.

2    A.   Sangriento:  "I'm going to leave the phone with this dude.

3    You can chat with him because I'm going to go up to go to the

4    mountain."

5    Q.   We can stop there.  Did CW-1, I believe you indicated that

6    he had a separate camera.  Did that camera allow him to

7    physically move?  Was it on his person?

8    A.   It was on his person, yes.

9         MR. PASRICHA:  If I can have everyone, please, turn to

10:00AM 10   the next, Exhibit 225.

11   Q.   And, Trooper, we're going to read the entirety of these

12   three pages.

13        CW-1:  "How are you counting, man?  With a metronome

14   or mentally?"

15   A.   Demente:  "Mentally."

16   Q.   "Okay, then."

17   A.   Demente:  "Mentally."

18   Q.   "Okay, then, dog, but go over then."

19   A.   "No way, bro."

10:01AM 20   Q.   "Exactly.  It's cold.  Hey, whoever is not coming in here

21   should stay."

22   A.   "That's right (unintelligible)."

23   Q.   "Hey, the ones not coming in here, let them stay here."

24   A.   "It's better if they go back then."

25   Q.   "Bullshit, it's cold, doggie.  Stand up over here.  It's

better so that you won't bash this dude here against this

rock."

A.    Crazy:  "Lend me you cap."

      Sangriento:  "So where is it going to be, here?"

      Demente:  "No, it's going to be..."

Q.    "It's fine, there, dog.  It's nice and cushioned around

here by the grass.  You're lucky."

A.    Demente:  "There's no turning back here.  For the things

that we are going to do -- we are going to be doing with the

homie, dude, now you will belong to the barrio."

Q.    "Hey, doggie, the ones that are not going in, right here,

dude."

A.    Demente:  "Yes, for being now one (unintelligible).  You

have been acquiring it for where you're heading, and right now

you already know perfectly (unintelligible)."

Q.    "Hey, doggie."

A.    Demente:  "The problem is that..."

Q.    "Careful."

A.    "Soon, doggie."

Q.    "Hey, come over here, dude."

A.    "The shoes."

Q.    "Hey, cover over here, someone with the rock, here this

thing so that this dude won't end up falling on it here,

doggie."

A.    Gasper:  "I am going to stand up over here so that I can

1    cover this rock."

2          Lagrima:  "Yeah, because when I got beat in, didn't I

3    break a wall with my forehead?"

4          Sangriento:  "Yeah, but the face and the balls are not

5    fair game."

6    Q.   "No, doggie."

7    A.   Demente:  "No, nothing on the face or balls."

8          Lagrima:  "I broke a wall."

9    Q.   CW-1:  "You guys already know, just the ribs and the back,

10:03AM 10   huh?"

11   A.   Demente:  "You already know that you have to cover your

12   face and your balls, dude.  We already know the fucking problem

13   with a kick on the balls."

14   Q.   CW-1:  "No, not here, doggie, here we never go over there

15   because they might be patrolling that place."

16   A.   Sangriento:  "So you're not going to send me over there

17   because I'll kill myself."

18          Demente:  "(Unintelligible), doggie, if you got to the

19   parking lot (unintelligible) at the first fall, you get up.

10:03AM 20   Let him get up by himself and get some air.  The second time

21   you guys already know."

22          Sangriento:  "Come on, come on."

23   Q.   "Hey."

24   A.   Sangriento:  "That's right, do it, it's better that you

25   pick me up right away, dude."

1        Demente:  "(Unintelligible)."

2    Q.   "Hey, dog, come over here so that this dude won't hit

3    these rocks.  Cover that, cover that there."

4    A.   Demente:  "Are you already?"

5    Q.   CW-1:  "Cover over here, cover this rock so that the dude

6    won't end up over here."

7    A.   Demente:  "Start."

8    Q.   "Over this way, dude.  Bring him over this way."

9    A.   Sangriento:  "Oh, shit."

10:04AM 10       Demente:  "Two more."

11   Q.   "Knock him down, knock him down, bring him over here.

12   Hey, over here, over here, doggie, not there, not there, over

13   here.  Over here, doggie.  Don't bring him there to see if

14   there's a rock or something.  Keep hitting him."

15   A.   Gasper:  "Get up, doggie.  Let him get up.  Let him get

16   air."

17       Demente:  "Hit him."

18   Q.   "Hit him, no, this dude's going to fall."

19   A.   Demente:  "That's 13 already.  The Mara."

10:04AM 20   Q.   "The Mara, dude."

21   A.   Crazy:  "The Mara, dude."

22       Chuchito:  "Welcome to the Mara, homie, welcome to the

23   Mara, homie."

24       Lagrima:  Great for you, doggie.

25       Gasper:  The Mara, doggie.

1    Q.    Fuck, doggie.

2          Chuchito:  Fuck, doggie. (Unintelligible) something,

3    doggie, so that you will always remember us, doggie.

4    Q.    Remember.

5    A.    Crazy:  Hey, doggie, remember, remember, listen, doggie,

6    look at the time.

7          Demente:  Relax.

8    Q.    Just relax.

9    A.    Remember the time and the date.

10:05AM  10   Q.    That's right, doggie, 6-11-36, doggie.  Uh-huh, keep it

11   well imbedded in your mind, doggie.

12   A.    Sangriento:  Do you have something of that?

13   Q.    Awesome, doggie, it gets to me.  I'm telling you, you did

14   well, doggie, with the grass here, doggie.  At the garage, you

15   would have fallen on the floor.

16   A.    Lagrima:  When I was kicked in, it was on cement.  I broke

17   the wall with my forehead.

18         Demente:  So, Sangriento, yes I'm going to say only

19   this.  I'm speaking to you for all the others, you know, all

10:05AM  20   that because you're a man.  You're going to gain respect by the

21   way you talk and the way you (unintelligible) people.

22   Q.    Your attitude is what's going to talk, doggie.  Don't

23   think just because you're a homeboy, no way, over time you will

24   see, homie.

25   A.    Demente:  Today you started a new world.

```
 1    Q.    That's right.

 2    A.    Today a blindfold will fall off your eyes, you know.

 3    Q.    One thing, never look down at the others, whether paros or

 4    chequeos.

 5    A.    Sangriento:  Because we all live for the same things.

 6    Q.    That's right, we all go through the same things, homeboy.

 7    A.    Yes.

 8    Q.    And it's awesome, you know, going forward and that's all.

 9    A.    Lagrima:  We'll create one group at a time.
```

10:06AM 10          MR. PASRICHA:  Nothing further, your Honor.

```
11                THE COURT:  Cross.

12                MR. BOURBEAU:  Nothing further.

13                THE COURT:  You may step down.

14                MR. PASRICHA:  One moment, your Honor.

15                Your Honor, the prosecution rests.

16                THE COURT:  All right.  I'll see counsel at sidebar.

17                (THE FOLLOWING OCCURRED AT SIDEBAR:)

18                THE COURT:  Okay.  Before we get to your motion, I'm

19    going to make my Petroziello final ruling, which is that I find
```

10:07AM 20    as a final matter that these statements that were introduced as

```
21    co-conspirator statements previously identified either in the

22    government's filings or otherwise on the record were made in

23    furtherance of the conspiracy and during the course of the

24    conspiracy, and, therefore, admissible under Rule 801(d)(2)(e).

25                All right.  Do you have a motion?
```

1          MR. BOURBEAU:  Yes, I have a motion for judgment of

2     acquittal, just simply that the government has not produced

3     sufficient evidence that a rational trier of fact could

4     conclude that there was the RICO conspiracy charged.

5          THE COURT:  Okay.  That motion is denied, and we'll

6     have the clerk docket the paper form of your motion.  Okay.

7          (SIDEBAR CONFERENCE WAS CONCLUDED)

8          THE COURT:  Mr. Bourbeau.

9          MR. BOURBEAU:  Yes, your Honor if I may have one

10:08AM 10     moment, please.  At this point, the defense would call

11     Dr. Steven Laken.

12          THE COURT:  All right.  Dr. Laken.

13          STEVEN LAKEN, having been duly sworn by the Clerk,

14     testified as follows:

                          DIRECT EXAMINATION

16     BY MR. BOURBEAU:

17     Q.   Good morning, Doctor.  Could you please state your name

18     and spell your last name for the record.

19     A.   Good morning.  My name is Dr. Steven Laken, L-a-k-e-n, and

10:09AM 20     Steven is spelled is S-t-e-v-e-n.

21     Q.   Where are you employed?

22     A.   I'm employed by a company that I own called Cephos spelled

23     C-e-p-h-o-s.

24     Q.   And what's the nature of that company?

25     A.   The company I founded provides consulting services biotech

1  companies as well as providing consulting services to attorneys

2  when there is DNA evidence that's in the case.

3  Q.   Well, what is your education, training and experience in

4  DNA testing and analysis?

5  A.   Yes, I earned by bachelor of science degree in genetics

6  and cell biology from the University of Minnesota in 1993.  I

7  then went on to graduate school at Johns Hospital Medical

8  School and graduated in 1999, and the program that I was in was

9  called cell and molecular medicine, and when I was in

10:10AM 10  undergraduate work, I was working on using DNA to diagnose

11  genetic diseases like albinism and breast cancer.

12       I also worked as a technician at the University of

13  Minnesota where I helped develop some of the electropherogram

14  techniques and electrophoresis techniques in an automated

15  system, and in graduate school, I worked on diagnosing genetic

16  diseases, specifically using genetics to diagnose different

17  types of colorectal cancer and predispositions for colorectal

18  cancer.

19  Q.   Have you lectured or taught any courses in reference to

10:11AM 20  DNA?

21  A.   Yes.

22  Q.   I do a number of continuing legal education courses for

23  attorneys where I educate them on DNA forensics and DNA

24  evidence.  I've also lectured, used to lecture at the Nashua

25  Community College where I taught genetics, microbiology and --

1    yeah, genetics and microbiology.

2    Q.    Have you published any articles in the field of DNA?

3    A.    I have, yes.

4    Q.    What are those?

5    A.    I published 12 papers that have been peer reviewed, and

6    peer review basically means they've gone through a review of

7    the scientists in a blinded fashion and then published in a

8    scientific journal, and those papers deal with genetic testing

9    and predisposition testing.

10:12AM 10    Q.    Have you testified previously concerning DNA testing or

11    analysis?

12    A.    Yes, I have.

13    Q.    And how many times?

14    A.    I've testified over 30 times.

15    Q.    Okay.  In what courts have you testified?

16    A.    The courts that I testified in are both district and

17    superior courts in the State of Massachusetts as well as

18    Vermont and Rhode Island.

19    Q.    And were you retained by my office concerning this case?

10:12AM 20    A.    Yes.

21    Q.    And doing some examinations?

22    A.    Yes.

23    Q.    What are some of the steps you took to assist?

24    A.    When I'm retained by an attorney to review DNA evidence,

25    it can consist of reviewing just the testing that was done by

1      the state labs, in which case in Massachusetts, there's a

2      Massachusetts State Police Lab as well as the Boston Police Lab

3      both do DNA testing.

4           When those labs perform testing, they basically

5      generate a paper trail of what they've done, and I review that

6      paper trail, what's called the DNA case file.  Before the DNA

7      testing gets done, there's the previous step is the criminalist

8      gets the evidence, reviews the evidence, and documents what he

9      or she may see, and then I will review that as well.

10:13AM 10           In some circumstances, the testing is what's called

11     exhaustive or consumed, and what that means is that there's

12     only going to be one test that can be performed.  There's a

13     sample that's taken, and during the processing of that sample,

14     there's no opportunity for a defendant to perform his own

15     testing, and so I'm allowed to come in and witness testing

16     that's done in either of those two labs when the DNA testing is

17     going to be exhaustive.

18     Q.   Well, in this case, did you go to the Boston Police

19     Department Crime Lab as well as the Mass. State Police Crime

10:13AM 20     Lab for some exhaustive testing?

21     A.   Yes, I did.

22     Q.   And do you do any testing yourself?

23     A.   I don't do testing myself, though I will take swabs in

24     certain circumstances, basically if there's a piece of evidence

25     that the State Police won't test, I can take a swab of that and

1      send it to a DNA testing lab.

2      Q.    Have you reviewed the reports and conclusions of the

3      Boston Police Crime Lab concerning the Falcon Street homicide?

4      A.    Yes, I have.

5      Q.    And in reference specifically, and I'd like to limit it to

6      the knives that were examined and the swabs that were collected

7      from the knives from the Falcon Street homicide, what exactly

8      did you examine?

9      A.    Basically you're talking about the knives specifically.  I

10:14AM 10    reviewed the DNA case file, I've reviewed the criminalistics

11     file, and I was also present during some of the testing.

12     Q.    Well, did you examine the -- what's an electropherogram?

13     A.    Electropherogram is when DNA is recovered, then it goes

14     through a process in the laboratory, we amplify it, we

15     basically make millions of copies of that piece of DNA, and the

16     piece of DNA then is labeled with a fluorescent tag.

17          The piece of DNA is then what's called electrofreezed.

18     It's basically put into a matrix with electrical current, and

19     the DNA migrates or basically moves by sizes, and so what we

10:15AM 20    can do then is we can look at these sizes of those pieces of

21     DNA, and the computer will automatically score or provide a

22     number for the piece of DNA that's seen.  That chart is called

23     an electropherogram.  Like a cardiogram, it basically grams a

24     picture of it, and so it's a picture of what the computer is

25     seeing.

1    Q.   All right.  As a chalk, showing you an example of the

2    electropherogram for item 41.05, a swab from the textured area

3    of the knife handle from Falcon Street.

4              THE COURT:  For the record, we'll mark this as D, as

5    in dog.

6              (Exhibit D was marked for identification.)

7    Q.   Could you explain to the jury what is depicted in the

8    chart?

9    A.   Yes.  What you basically see are the two boxes have peaks

10:16AM 10   in them or numbers in them, like 14, 15, 16, 17, 18, 19, 9, 11.

11   Above the 14 and 15, there's a box.  You can't actually see

12   what it says in there, but the box represents a place in the

13   DNA where we all have that piece of DNA, and in this case, the

14   computer is looking at what pieces of DNA are showing up at

15   that place.

16             So there's a 14 and a 15, and the 14 and 15 basically

17   represent size differences, and so DNA can have different

18   sizes, depending on what a person inherits from their parents.

19             In this case, when we're looking at evidence, we're

10:17AM 20   not necessarily looking at DNA that's coming from one person,

21   it come could from multiple people, but we're looking at 14 and

22   15 is one place, and so that's a number that then I would use

23   to compare a reference sample to.

24             Going to the right of 14 and 15, there's a 16, 18, 19,

25   and the 16, 18, 19, what that starts to tell me is that because

1   there are three numbers there, there has to be a second person

2   contributing DNA to this because at most a person can have one

3   number from their mother and one number from their father or

4   two numbers.

5           Because there's a 16, 18, 19, it's likely that two of

6   those is probably coming from one person, and another one is

7   coming from a second person.

8           You also see that the 16 has a very, very large peak,

9   and the 19 has a large peak, but the 18, which is between the

10:18AM 10   two, it's almost an insignificant peak or a very small peak,

11   and what that means is that the contributor the person who left

12   DNA on this item, the likely person, one of those people was

13   likely a 16, 19, and the other person was 18, something.

14           Moving off to the right, then we see a 9 and 11, and

15   because there's two numbers, it's probably one contributor, it

16   could be two but it looks like one.

17           Moving to the next one, 10 to 12, 10 to 12, and then

18   finally to the far right, you see an 8, 10 and 11.  Again, the

19   8 is a very, very small number, and the 10 and 11 is a very

10:19AM 20   large number, so this suggests to me as a person who looks at

21   these a lot that the 10 and 11 is likely coming from one

22   person, the 8 is coming from the second person.

23           Moving down, we can also determine whether or not one

24   of the contributors is a male or a female, and what you see is

25   there's a 2.  2 is basically on a place on the Y chromosome, so

1    only men have a Y chromosome.  A Y chromosome is passed from

2    his father to all his sons.  Because there's only a single Y

3    chromosome, and there's only a single number if there's only a

4    single male contributor.

5              In this case, we see a single number, again,

6    consistent with likely a single male contributor, and then to

7    the right of that, we see an X and a Y.  The peaks are about

8    the same height, so this suggests that that contributor is a

9    male.

10:19AM 10   Q.   Did you prepare any charts to help explain or analyze how

11   it applied to Mr. Edwin Gonzalez?

12   A.   Yes, I did.

13   Q.   Do you see that chart or a copy of that chart?

14   A.   Yes.

15             MR. BOURBEAU:  If we could mark this as the next for

16   identification.

17             THE COURT:  We'll call it E.

18             (Exhibit E was marked for identification.)

19             THE COURT:  Go ahead.

10:20AM 20   Q.   And basically what did you do in putting together this

21   chart?

22   A.   So what you see on the first column where it says

23   "description," below that, there's what's called an address on

24   the DNA or location.  The technical term is a "locus" for

25   singular, or "loci" being plural, and this one is -- it's hard

1   to read it, but it looks like D3S1358.  So what that stands for

2   is basically an address on the DNA.  And where you saw those

3   peaks from, now what I can do is fill in what the computer saw

4   on that.

5          So on the previous slide, there was a 14 and 15, and

6   so if you go to the very far right-hand column, where it says

7   the swab from the textured area of knife handle, basically from

8   the electropherograms, then I type in 14, 15.

9          At the next location, VWA, on the far right, again,

10:22AM 10   another different place on the DNA.  The electropherogram said

11   16, 19.  With that very, very small peak at an 18, which was

12   this, that little blip, and so the 16, 19 basically represents

13   that there's two numbers there, and the 18 says that there was

14   a very, very small amount of DNA, and it was basically below

15   the lab's threshold, and then that's moving down the entire

16   chart, then I basically fill in what was seen from the

17   electropherogram.

18          On the second, third and fourth columns or the three

19   middle columns, Item 15.02, 58 and 60, these are basically the

10:22AM 20   known or reference samples from Mr. De La Cruz, Mr. Gonzalez

21   and Mr. Diaz, and so a D3S1358, Mr. De La Cruz is 14, 15,

22   Mr. Gonzalez is 15, 18, and Mr. Diaz is 14, 15.

23          What we try to do is then what then ends up happening

24   is that the profiles that are shown in the far right-hand

25   column are compared to the profiles with the three known

1    contributors here or the three knowns from these individuals.

2         We don't know whether they're contributors or not to

3    the evidence sample, and so you can think about this a little

4    bit like a lottery ticket where on the evidence sample, what

5    we're looking for is are there numbers that exist in the

6    evidence sample that are also consistent with the numbers from

7    one or more of these three -- one or more of these three

8    individuals.

9         So, just holding it there for a second, at D21S11, the

10:23AM 10   very top, you can see the evidence is 2831.2, and so at D21S11,

11   Mr. De La Cruz is 2831.2, but neither of the other two males

12   that are contributing are 2831.2, so you have to have both of

13   the numbers, and since there's a 3031.2, that's not showing up

14   in the evidence, and a 29 that is also not showing up in the

15   evidence, that allows me to basically say based on that

16   location, I can begin to exclude these two other individuals,

17   and one person is still included as a potential contributor.

18        It's the entire profile that needs to be looked at,

19   not necessarily one location, but if moving down to the next

10:24AM 20   row at D18S51, there's a 13, 18, the evidence is 13, 17, 18,

21   so, again, Mr. De La Cruz is consistent with 13, 18, but the

22   two other individuals are not consistent with what's found in

23   the evidence.

24        And so I basically, when I'm looking at these and

25   making these comparisons and making an opinion as an expert,

1   I'm going through and looking at are there numbers that are

2   entirely consistent in the evidence that are consistent with

3   one of the profiles from one of these individuals.

4   Q.   And based on your analysis of item 41.05, can you explain

5   based on your conclusions whether it includes or excludes

6   Mr. Edwin Gonzalez?

7   A.   Yes, based on my opinion, I can include Mr. De La Cruz

8   because all of his numbers are showing up in the evidence, but

9   I can exclude Mr. Gonzalez and Mr. Diaz because their numbers

10:25AM 10   are not showing up in the evidence.

11   Q.   You had mentioned that the lab had indicated some of these

12   numbers were below threshold.  What does that mean?

13   A.   Yes.  The lab established a threshold where those peaks

14   that you saw in the previous exhibit have to achieve a certain

15   threshold for them to report that, and peaks that don't achieve

16   that are basically above what's called the stochastic threshold

17   but haven't achieved a level of significance.

18        The labs often denote that by these parens, and what

19   that means is that they don't have huge confidence that there

10:26AM 20   may not be pieces of DNA that are missing from a possible

21   contributor, and so, therefore, the labs will -- they'll make

22   the conclusion that they can't make a comparison because the

23   DNA hasn't reached that threshold.

24        But this was something that changed a couple years

25   ago, and what's called the SWGDAM guidelines basically said you

1    can only make conclusions based on the recommendation, not that

2    it's a standard, but the recommendation was that the labs

3    should only make conclusions on when the alleles are all above

4    or these numbers are all above thresholds, so that's not a

5    scientific consensus, it's just one opinion by one group, but

6    the labs have generally taken that and used that as part of

7    their protocols.

8    Q.    And what about based on your experience with other

9    laboratories, do all laboratories follow those same protocols?

10:27AM 10    A.    No, they don't.

11    Q.    What other labs do not?

12    A.    That's correct.

13    Q.    Can you give an example of some other labs that don't

14    follow that protocols?

15    A.    So recently I reviewed both some DNA testing that occurred

16    in Vermont as well as Rhode Island, and they use these alleles

17    below threshold, and I should say up to two years ago, both

18    state labs, both the Boston Lab and the Commonwealth, also used

19    these up until two years ago, so it's not like something

10:27AM 20    happened in the scientific literature that two years ago all of

21    a sudden things changed and the scientific community said this

22    isn't appropriate to use, it's just that what the guidelines

23    are trying to do is establish something so that all of the labs

24    across the country would make the same exact conclusion, and in

25    doing so, what they do is they leave information that could be

1    useful for including or excluding people.  That's not being

2    used.

3    Q.   Based on your opinion to a reasonable degree of scientific

4    certainty, Mr. Gonzalez is excluded from 41.05?

5    A.   Yes.

6    Q.   And that's based on this information that you received

7    from the laboratory for their own testing?

8    A.   That is correct.

9    Q.   What about item 24.03, a swab?

10:28AM 10        THE COURT:  It actually might be a good place to take

11   a break.

12        MR. BOURBEAU:  Oh, certainly, your Honor.

13        THE CLERK:  All rise.

14        (JURORS EXITED THE COURTROOM.)

15        (A recess was taken.)

16        THE CLERK:  All rise for the jury.

17        (JURORS ENTERED THE COURTROOM.)

18        THE CLERK:  Thank you.  You may be seated.  Court is

19   now back in session.

10:44AM 20        THE COURT:  All right.  Mr. Bourbeau.

21   Q.   Dr. Laken, before the break, we were moving onto the next

22   item, which is item 24.03, swab from a knife handle from the

23   Boston Police Department Crime Lab.  Did you prepare a chart in

24   this case as well to explain your conclusions --

25   A.   Yes.

1    Q.    -- concerning that particular item?  And could you explain

2    what those conclusions were with the chalk?

3    A.    Yes, so this is very similar to the chart that -- the

4    exhibit that was shown previously.  We have in 15.02, 58 and

5    60, are the three known profiles for Mr. De La Cruz,

6    Mr. Gonzalez and Mr. Diaz respectively.

7          Shown on the left are the locations.  Those are the

8    same locations that were shown before, the loci, and then the

9    DNA profile that was obtained from the handle of the knife from

10:45AM 10    item 24.

11          So this was a swabbing that was taken from the knife

12    handle, and DNA was recovered, and the DNA profile that was

13    generated was shown on the very last column on the right.

14          So this is essentially the same thing, the 15, 14, you

15    can see that the 14 is basically in quotes, and what that means

16    is that there's not exactly the same amount of 14 DNA or the

17    amount of 14 as there is 15.  They're a little bit imbalanced.

18    It means there's more DNA coming from 15 than 14.  It may be

19    relevant, it may not be, but if you look at the 14, 15, you can

10:46AM 20    see that Mr. De La Cruz and Mr. Diaz are both 14, 15, so at

21    that location alone, both of those individuals may potentially

22    be included.

23          Move down to the next row at VWA, the evidence in 16

24    in quotes and 19, that is below the lab's threshold.  We see a

25    16 and a 19.  That's what the lab reported, and what you see is

1    that Mr. De La Cruz has a 16, 19, but neither Mr. Gonzalez nor

2    Mr. Diaz have that.

3    Q.   So, at this point in time, is Mr. Gonzalez excluded?

4    A.   Yes, I believe my opinion is that I can exclude

5    Mr. Gonzalez from contributing DNA to the handle of the knife.

6              THE COURT:  I'm sorry.

7              MR. BOURBEAU:  I'll mark this, this will be F.

8              THE COURT:  F, okay.

9              MR. BOURBEAU:  For identification.

10:47AM 10          THE COURT:  Yes.

11             (Exhibit F was marked for identification.)

12             THE COURT:  Go ahead.

13   Q.   And moving onto 56.06, from the Boston Police Lab, another

14   swab from handle of knife.  And did you make an analysis of

15   this particular item?

16   A.   Yes, I did.

17   Q.   And what was that?

18   A.   On this one, Mr. De La Cruz can also be included as a

19   potential contributor.

10:47AM 20   Q.   Okay.  But what as to Edwin Gonzalez as to this particular

21   item?

22   A.   Mr. Gonzalez and Mr. Diaz may both be excluded as

23   potential contributors to the DNA left on this item.

24             MR. BOURBEAU:  And I mark this as the next, which

25   would be G for identification.

1          (Exhibit G was marked for identification.)

2    Q.   Moving onto item 56.07, which is a swab from the blue

3    fabric of the handle of the knife, did you make this chart to

4    explain your analysis and conclusions?

5    A.   Yes, I did.

6    Q.   And what were your conclusions?

7    A.   That Mr. De La Cruz can be included as a potential

8    contributor to the swab from the blue fabric and that

9    Mr. Gonzalez may be excluded.  I also believe that Mr. Diaz can

10:48AM 10   be included as a potential contributor to this item as well.

11          MR. BOURBEAU:  And that would be if I can mark this as

12   H for identification.

13          THE COURT:  All right.

14          (Exhibit H was marked for identification.)

15   Q.   What is considered "dropout"?

16   A.   Dropout is a term that's used that basically says that if

17   there's DNA present on an item, so, for example, two numbers,

18   Number 1 and Number 2, should be found on the item if I handle

19   or touch the item.

10:49AM 20          If there's not enough DNA, sometimes what's only seen

21   as a Number 1 or a Number 2 or even sometimes there's no DNA

22   that's seen, if there's very little DNA that's left on the

23   item.  Dropout specifically refers to that one of those two

24   numbers doesn't appear, so instead of having a 1 and a 2 on the

25   evidence item when we expect a 1 and a 2 to appear, what we're

1    only seeing is basically a 1 appearing or a 2 appearing, so the

2    1 number is dropping out.

3    Q.   But if there's two numbers at different locations, that

4    can still assist in your analysis and conclusions?

5    A.   Yes.

6    Q.   For example, only one location may only have one number,

7    but 20 or more locations have two numbers?

8    A.   So it's important to look at the entire profile and see if

9    there's numbers that are consistently showing up from a

10:50AM 10    potential contributor when one is doing a comparison, so it's

11    important to look at each and every one of those loci and to

12    look at the numbers that are showing up in those loci and then

13    to make a conclusion based on the entire profile and not

14    necessarily just one or two locations.

15    Q.   You also, as you said earlier, had gone to the Mass. State

16    Police Lab and reviewed the exhaustive testing?

17    A.   Yes.

18    Q.   As well as did you also analyze their testing and the

19    documents you received from their testing?

10:51AM 20    A.   Yes, I did.

21    Q.   By the way, you're aware that there were some items of

22    evidence that were never tested at the State Police Lab?

23    A.   Yes, I am.

24    Q.   You've reviewed the criminalistic report as well?

25    A.   I have, yes.

```
 1    Q.    Items such as a cell phone?

 2    A.    That's correct.

 3    Q.    A folding pocket knife?

 4    A.    Yes.

 5    Q.    A headphones?

 6    A.    Yes.

 7    Q.    Keys?

 8    A.    Yes.

 9    Q.    Okay.  And were those items tested at all?

10    A.    I didn't find any evidence that those were tested by the

11    Mass. State Police or by anybody.

12    Q.    Would those items be good carriers of DNA?

13    A.    Yes, they can be.

14    Q.    And, for example, headphones, would they be a good carrier

15    of DNA?

16    A.    Anything that our body comes into contact with can be good

17    carriers for DNA, so, for example, headphones, which are

18    constantly in touch with the ears, the side of the face and are

19    typically not cleaned, you'd expect to find DNA on those, keys

20    that someone handles, carries, puts in their pocket, juggles

21    with their hands, they're always going to have DNA.

22          Keys are not generally something that people clean on

23    a regular basis, so any DNA stays on those items, knives,

24    people handle and carry knives, as well as phones.  If you can

25    think about the last time that you cleaned your phone
```

1  thoroughly, even when you think you clean your phone, there's

2  nooks and crannies, it's up to your face, it's touching your

3  face, it's in your pocket, we're walking around with it with

4  your hand all the time, and we're also talking into it, which

5  means that some of the DNA from my mouth is also being

6  deposited there, so phones are particularly good.

7  Q.   What about if there's no blood on these particular items,

8  would you still swab them for DNA?

9  A.   Yes.  So items, so, for example, the cup that I've been

10:53AM 10  drinking out of here, I certainly haven't bled on the cup, but

11  I've left a lot of DNA in the process of putting it up to my

12  mouth.  As I mentioned, cell phones, headphones, those types of

13  things can have DNA from the skin that can show up and can be

14  good sources of DNA.

15  Q.   Were you also aware of an orange-handled knife, 12-2?

16  A.   Yes.

17  Q.   Were there any swabs for DNA on that knife?

18  A.   No swabbing was taken of that knife.

19  Q.   Now, from the criminalistic report, you're aware that some

10:53AM 20  of these items were in the ocean or in salt water?

21  A.   Yes.

22  Q.   Would salt water necessarily remove DNA?

23  A.   Not necessarily, no.

24  Q.   Okay.  Are items that are in water examined for DNA on a

25  regular basis?

1  A.    Yes.  So, two things when we do a DNA analysis, we

2  actually put the items in a salt water bath, so it's not like

3  the salt water destroys DNA.

4        The second thing is that there's a lot of research

5  going on right now where people are going around in the oceans

6  and taking basically small samples of the ocean and then

7  isolating the DNA and looking at the DNA that's left from

8  whales or dolphins or even the bacteria that are there, so we

9  know that that's a good indication of what species might be

10:54AM 10  floating around or in the ocean, so the salt water by itself

11  doesn't decrode or degrade DNA.

12  Q.   Well, specifically there was a swabbing of a handle from a

13  white-handled knife that was collected at Constitution Beach in

14  the State Police case, and did that contain some DNA?

15  A.    Yeah, this certainly has DNA on it.  You know, it's got a

16  DNA profile that's there.  Shown on the right-hand column here

17  is the DNA that was recovered from the State Police Crime Lab,

18  the prints, the alleles is below a threshold.

19        There wasn't a lot of DNA on this knife, but I

10:55AM 20  certainly couldn't say with any sort of, you know, scientific

21  conviction that that's because of the salt water versus you

22  know, maybe the knife was cleaned or something happened to the

23  knife before the DNA evidence was collected.

24  Q.   And were you able to make any conclusions concerning that

25  knife?

1    A.   On this one, I did witness testing.  I didn't see anything

2    that the analyst did incorrectly in testing.  When I looked at

3    this one, just because there's so many numbers that are just

4    single numbers, the NRs represent that the results are

5    basically no result, and I didn't see basically means there's

6    an inconclusive result, so there's a little bit of a blip.  You

7    know, I felt the most conservative way of making this call was

8    to say inconclusive.

9         MR. BOURBEAU:  Thank you.  I have nothing further.

10        THE COURT:  All right.

11                         CROSS-EXAMINATION

12   BY MR. MacKINLAY:

13   Q.   Let me get this straight, Mr. Laken, your conclusions

14   directly contradict the accredited lab conclusions of two labs

15   in the State of Massachusetts, the State Police Crime Lab and

16   Boston Police, and turn their protocols on their heads, true?

17   A.   I disagree with their protocols.

18   Q.   Well, you take what are determined to be unsuitable

19   findings and make inclusion or exclusion findings; is that fair

20   to say?

21   A.   I disagree with their protocols, and I look at the DNA

22   evidence and make my conclusions.

23   Q.   That wasn't my question, sir.  Do you take the

24   information, the data that they generate during the course of

25   their examinations, and you then take their unsuitable findings

1    and convert them in your experience to inclusion or exclusions,

2    true?

3    A.   On their protocols, yes.

4    Q.   All right.  What protocols are you using, just so we can

5    get that out?

6    A.   Yeah.  So it's really important that that's a very good

7    question.  So the history of genetics basically start off --

8    Q.   Can I interpret you for a second.

9         THE COURT:  Hold on.  He asked you what protocols you

10:58AM 10   are using, not what the history of genetics is.

11   A.   No, no, I have my genetic experience, and my genetic

12   experience basically says that I've worked on these, I've

13   looked at these, and I can use these to basically make

14   inclusions or exclusions.

15   Q.   I understand that, but you've got to have something to

16   measure it against, the protocol; am I right?

17   A.   Yes, and you look at the numbers.

18   Q.   So, please describe to the jury the protocol from the

19   Vermont lab, the protocol from the FBI lab, the protocol from

10:58AM 20   the Rhode Island lab, someplace where you got a standard to

21   hold up against what the data that was collected by those labs

22   was.

23   A.   And I think I demonstrated how I was doing that to the

24   jurors.

25   Q.   You had no protocols to measure it against, you just used

1    your own experience; is that correct?

2    A.    When I look at the numbers, I use the numbers, and I

3    compare the numbers to the evidence, yes.

4    Q.    You would agree with me that thresholds that you dispute

5    at the two labs, thresholds for making inclusions or

6    exclusions, that's what we're talking about, those are mixture

7    interpretations set by the labs themselves, correct?

8    A.    They are set by the lab, that's correct.

9    Q.    And you dispute those, correct?

10:59AM 10    A.    That's correct.

11    Q.    Isn't it fair to say that those are set lab to lab because

12    of, as a result of calibration of the equipment at the lab?

13    A.    The labs set their own standards for what they feel is

14    relevant.

15    Q.    Okay.  And they set them lab to lab based upon standards

16    and tests that they do to calibrate their equipment, right?

17    A.    Yes.

18    Q.    And they do that to get a reliable scientific result

19    outcome, true?

11:00AM 20    A.    I don't agree that it's necessarily reliable.

21    Q.    Well, they had to develop the protocols someplace lab to

22    lab; is that right?

23    A.    They did, yes.

24    Q.    And you know that there's a process at BPD lab and MSP

25    lab, correct?

1   A.    Yeah, and I also know that when they follow these

2   protocols, the protocols can be incorrect, and they can make

3   false inclusions or exclusions.

4   Q.    Sorry to interrupt you, sir.  So you're finding that, now

5   you're saying that their protocols are in error?

6   A.    They've been in error, yes.

7   Q.    Is the FBI protocol also similar to the local protocols?

8   A.    I'm not familiar with the FBI protocol.

9   Q.    You mentioned Vermont and Rhode Island.  How are their

11:00AM 10   protocols different?  Do they have different equipment?

11  A.    They do, yes.

12  Q.    Wouldn't that explain why they use different protocols and

13  measuring sticks, sir?

14  A.    No, it doesn't.

15  Q.    Let's go back and talk a little bit about your background

16  before you ended up here today.  You're not a forensic

17  scientist, correct?

18  A.    I am not a forensic scientist.

19  Q.    So you have not had that type of training and experience

11:01AM 20   to conduct the testing, correct?

21  A.    Can you be specific about the type of training?

22  Q.    Certainly.  The type of DNA analysis testing that was done

23  by Joseph Ross and the staff at the Massachusetts State Police

24  Crime Lab, DNA typing?

25  A.    I would disagree with that.

Q.    By the way, you're not also a crime scene analyst, are

you, sir?

A.    I'm not a crime scene analyst, no.

Q.    So when you talked a minute ago about what things should

be tested at the crime scene, you had no basis for doing that

in your experience either, do you?

A.    I disagree with that.

Q.    You don't have any training in that regard, do you?

A.    I have a degree in genetics and cell biology, and then I

went on to get cell and genetic medicine.  To be clear,

genetics was a field long before there was a forensic genetics.

      This was one of the few scientific fields where

genetics was developed, and then the scientists actually

decided that this could be used for forensic purposes, so all

of the genetics that was used by geneticists, that was

developed when I was doing my training in both undergraduate

and graduate work was for pre any sort of forensics, and all

the genetics came before it was applied in the forensics field.

Q.    And that has what to do with picking up evidence at crime

scene and figuring out what's forensically relevant to be

tested?

A.    I've been doing this for 10 years, I've worked in over 500

cases.  I have a very clear idea of what things have been

tested, what's the history, what things show good profiles,

what don't show good profiles.  I stay up to date with the

1   literature.  I also go to conferences, and I also read

2   publications, and all of those things basically help --

3           THE COURT:  You need to listen to the question and

4   answer the question that's being asked.  Go ahead.

5   Q.   You've never performed any forensic examinations in the

6   lab; isn't that fair to say?

7   A.   I've taken DNA samples for forensic purposes.

8   Q.   You've taken samples, swabs from people, correct?

9   A.   I've taken swabs from people, I've also taken swabs from

11:03AM 10   evidence.

11   Q.   But the actual examination you have not done, true, you've

12   just essentially observed others doing the work, correct?

13   A.   To be clear, let's talk about what you specifically mean

14   by examination.

15   Q.   Taking the known sample, taking a suspect sample,

16   conducting the four-step analysis that was done according to

17   the protocols of the Massachusetts State Police, excuse me,

18   Boston Police Laboratory, taking the five steps that we've

19   heard about for the examination of the scientific evidence at

11:04AM 20   the Boston Police Laboratory and then interpreting the results.

21   You do the interpreting of the results piece, correct?

22   A.   So, are you specifically talking about the four pieces DNA

23   isolation, DNA quantification, DNA amplification,

24   electrophoresis, developing and profile; is that what you're

25   talking about?

1    Q.   I'm asking you those four steps at the labs, do you do

2    them yourself?

3    A.   So I've done those four steps many times.

4    Q.   Okay.  But you haven't done them in this case?

5    A.   I did not do them in this case.

6    Q.   Okay.  You have never been competency tested in your

7    experience now, have you?

8    A.   No, I have not competency tested.

9    Q.   Or proficiency tested ever?

11:04AM 10    A.   No, I have not.

11    Q.   And you have described some publications that you have

12    done in the area generally of DNA work; is that correct?

13    A.   That is correct, yes.

14    Q.   Isn't it fair to say that only one of those involves DNA,

15    more specifically forensic-related DNA?

16    A.   That seems reasonable, yes.

17    Q.   And that was how long ago?

18    A.   A while ago, yes.

19    Q.   Well, from looking at your resume' that you submitted, it

11:05AM 20    looks like it was almost 20 years ago?

21    A.   So, Yeah, I think that's fair to say.  In my graduate

22    work, when I published those papers, they could be used for

23    forensic purposes, and I have done work since then.  It has not

24    been published.

25    Q.   Your company Cephos, is it called; am I pronouncing that

1    right?

2    A.    Cephos.

3    Q.    Cephos, excuse me.  You have other activities with that

4    company besides the consulting you've described and done in

5    this case, true?

6    A.    No.

7    Q.    You just do that with that company?

8    A.    Yes.

9    Q.    Previously you had worked in different capacities based on

11:06AM 10   your experience, including being an inventor?

11   A.    Yes.

12   Q.    Invented a lie detector type process, correct?

13   A.    That's correct, yes.

14   Q.    And you invented a disinfected process for toilets?

15   A.    That didn't get patented.

16   Q.    You invented it, it just didn't get through?

17   A.    That's correct.

18   Q.    Those had nothing to do with your experience to review DNA

19   material and render any sort of opinion here today, correct?

11:06AM 20   A.    I disagree.

21   Q.    Okay.  When you mentioned lawyers or attorneys, I believe

22   that you have worked with and trained and consulted with in the

23   past, would it be fair to describe them all as defense lawyers?

24   A.    Yes, they would describe themselves I'm sure as defense

25   lawyers.

1    Q.    In other words, you've exclusively worked consulting on

2    criminal cases in particular for the defendants, correct?

3    A.    Yes, that's correct.

4    Q.    How much would you suggest of the income of your company

5    comes from that source of income?

6    A.    Somewhere between 40 to 50 percent.

7    Q.    And how long has that gone on for?

8    A.    Since about 10 years.

9    Q.    And you've received a significant amount of money through

11:07AM 10    that, through your business, through that aspect of your

11    business; is that correct?

12    A.    I don't know --

13          MR. BOURBEAU:  Objection.  Relevance.

14          THE COURT:  I'll allow it.

15    A.    Can you define significant?

16    Q.    Well, you have been contracted from the state and received

17    payments as a result of your activities in consulting on state

18    cases to the defense; isn't that right?

19    A.    I do, yes.

11:07AM 20    Q.    Okay.  Would you estimate -- could you estimate

21    approximately how much you've received from working exclusively

22    for the state cases for the defense?

23          MR. BOURBEAU:  Objection.

24          THE COURT:  I think now we're a little far afield.

25    Sustained.

1    Q.   You've also received payment for this case as well; is

2    that correct?

3    A.   I have, yes.

4    Q.   And what is your hourly fee, sir?

5    A.   $250 an hour.

6    Q.   How many hours do you figure you've put into the case,

7    there's a fair amount of evidence to review, I'm certain, it's

8    significant; is that right?

9    A.   It is, yes.

11:08AM 10    Q.   Have you totaled it up, sir?

11    A.   I haven't totaled it up, no.

12    Q.   You mentioned SWGDAM.  What's SWGDAM?

13    A.   SWGDAM stands for the Scientific Working Group for DNA

14    Analysis and Methodology.

15    Q.   A group you're a part of or you follow in your field?

16    A.   I follow, but I'm not a part of it, no.

17    Q.   In other words, you're not a member, but you do

18    periodically check their website and remain current?

19    A.   I do, yes.

11:09AM 20    Q.   In fact, I think you mentioned that they changed some

21    standards and relaxed some protocols, and based upon SWGDAM, I

22    believe your testimony was a few minutes ago that they've

23    changed the -- sort of relaxed standards and changed the

24    thresholds for protocols; is that essentially what you said?

25    A.   I never used the word "relaxed."

1     Q.    All right.  Well, changed?

2     A.    They did change the standard, yes.

3     Q.    And when was that, exactly?

4     A.    I believe it was 2017, 2016.  I don't know the exact date.

5     Q.    SWGDAM has, obviously, a fundamental principle of ensuring

6     that there are written procedures and that the protocols are

7     followed though; does that sound accurate to you?

8     A.    Yes, that's accurate.

9     Q.    You didn't follow any written protocols when you did your

11:09AM 10    examination though, did you?

11    A.    That's correct.

12    Q.    You mentioned dropout in the DNA analysis of samples,

13    correct?

14    A.    That's correct, yes.

15    Q.    Would you agree with me that there's a significant

16    possibility of dropout of DNA characteristics if that's the

17    case or could lead to an unreliable conclusion?

18    A.    Can you define "significant"?

19    Q.    Well, how about if I use a different word.  How about if I

11:10AM 20    suggested to you a real possibility of an unreliable finding

21    for dropout?

22    A.    Can you define "unreliable finding"?

23    Q.    Well, that would be a finding that we couldn't rely upon

24    in the scientific community to support an inclusion or an

25    exclusion, how about that?

1    A.   I disagree.

2    Q.   You think that you can make findings even with dropouts?

3    A.   If you know that dropouts occurred, then you certainly

4    result in -- dropouts will result in falsely excluding somebody

5    when they should be included, and that's a possibility that can

6    happen if you think that dropout is occurring.

7    Q.   Would you agree with me that with a limited amount, a

8    small amount of DNA in a suspect sample, that presents a small

9    amount of information to compare and could possibly be really

11:11AM 10    significantly affected by dropout?

11   A.   Again, significantly is -- if you can define that term,

12   I'd be happy to answer the question.

13   Q.   Well, how would you suggest that it would be impacted in

14   those circumstances the way that I described, sir?

15   A.   So the way you describe it, I've worked on two cases that

16   the lab basically led to an inconclusive result, and when I

17   reviewed the evidence in those two cases, I felt that the

18   person could be excluded.

19         As it turned out, further testing on those both led to

11:11AM 20   exoneration cases, one in Vermont and one here in Massachusetts

21   based on testing that was done by guidelines.  So when you talk

22   about significant, I guess when I look at the 500 cases that

23   I've worked on, and two of those have resulted in people who

24   have been wrongly convicted, even though I'm not using my

25   protocols, certainly what I'm doing has resulted in

exonerations.

Q.   Okay.  But you're taking very small amounts of information and taking a leap; isn't that correct?

A.   I'm not taking small amounts of information.  There's a number of loci that are looked at, there's numbers that have been generated at each one of those loci, and I'm using the data, the entire set of data that's available.

Q.   Exhibit 69 is an Ecko sweatshirt, and you looked at the data; is that correct?

A.   That is correct, yes.

Q.   And in terms of your examination of the data on that sweatshirt, there were two particular findings by the Boston Police Laboratory in particular that I wanted to ask you about, if that's okay.

A.   Yes.

Q.   Did you agree with the findings that the victim's blood was located in the area of the left arm of the jacket?

A.   May I refer to my notes, and then can you give me an item number?

Q.   I can give you an item number.  Just one second.  It's 31.03.

A.   And may I refer to my notes?

Q.   Certainly.

A.   So I have a 31.01, 31.03, yes.

Q.   You would agree with the finding that the victim's blood

1  is identified as being on the area of the sweatshirt in the

2  front of the sweatshirt?

3  A.   No, I disagree with that.

4       MR. MacKINLAY:  One second more, your Honor.

5  Q.   I think I referred to the item number wrong.  That may

6  have caused you the confusion.  I apologize for that, 31.01.

7  A.   May you please ask the question again?

8  Q.   Certainly.  Do you agree with the findings that the RBS on

9  that item was that of the victim, Cristofer De La Cruz?

11:15AM 10  A.   Yes, I do.

11  Q.   You also agree with the finding that on the item 31.03,

12  the swab to the collar and the sleeves of that particular

13  exhibit consisted of wearer DNA identified to Edwin Gonzalez,

14  the defendant?

15  A.   So answering the question the way that you asked, no.

16  Q.   Okay.  How would you answer it then?

17  A.   Thank you.  You said that it's wearer DNA.  Wearer DNA

18  basically refers to DNA that you know is from a wearer.  I

19  don't know that this is wearer DNA.  Certainly I agree that

11:15AM 20  Mr. Gonzalez' DNA profile is showing up on this as well as at

21  least two other people's profile.

22  Q.   You just dispute the fact that I used the term "wearer

23  DNA" in error, correct?

24  A.   Yes.

25  Q.   Not the finding?

1    A.    That's correct, yes, sir.

2          MR. MacKINLAY:  One moment, please, your Honor.

3    Q.    Just to be clear, rather than going through item by item

4    with you, Mr. Laken, you don't dispute any finding of an

5    inclusion made by the Boston Police Department on any of their

6    DNA analyses, correct?

7    A.    That is correct, yes.

8    Q.    You do not dispute any of the findings of the

9    Massachusetts State Police on any of their testing that

11:16AM 10  resulted in identification or inclusion; is that correct?

11   A.    That is correct, yes.

12   Q.    What you're talking about is the unsuitable for further

13   comparison to the known samples, you believe you can do more

14   than them, true?

15   A.    Yes.

16         MR. MacKINLAY:  Nothing further.

17   A.    And SWGDAM guidelines allowed that two years ago.

18         THE COURT:  Redirect.

19                    REDIRECT EXAMINATION

20   BY MR. BOURBEAU:

21   Q.    Dr. Laken, you were asked questions concerning 31.01 and

22   31.03 swabs taken from the sweatshirt, correct?

23   A.    Yes.

24   Q.    On item 31.01, I mean 31.03, you indicated it was a swab

25   that was identified in part to Edwin Gonzalez?

```
 1    A.    That is correct, yes.

 2    Q.    Okay.  But you also mentioned two others, or was it two or

 3    three other contributors?

 4    A.    There's at least three contributors.  One of those

 5    contributors -- it could be three or more.  At least one of

 6    those contributors is Mr. Gonzalez.

 7    Q.    Is there any time stamp on DNA?

 8    A.    No, there's not.

 9    Q.    So you can't tell when Mr. Gonzalez or any of the other

10    three contributors came in contact --

11    A.    That is right.

12    Q.    -- with that sweatshirt?

13          MR. BOURBEAU:  Thank you.  I have nothing further.

14          MR. MacKINLAY:  No further questions, your Honor.

15          THE COURT:  Thank you.  You may step down.  Anything

16    further, Mr. Bourbeau?

17          MR. BOURBEAU:  Yes, your Honor a stipulation with an

18    exhibit.

19          THE COURT:  Okay.

20          MR. BOURBEAU:  A stipulation, and I'll read it.  It's

21    previously agreed to, and we've marked it with the permission

22    of the Court as Exhibit 299, and the stipulation indicates that

23    Defendant Edwin Gonzalez and the United States hereby stipulate

24    as follows:

25          Craig Beauregard, the Keeper of the Records for the
```

1  restaurant Johnny Rocket of Braintree, Mass, if called as a

2  witness, would state that the attached records are complete

3  employment records of the Defendant Edwin Gonzalez.

4       Also on Exhibit 300 previously marked and agreed to

5  with the permission of the Court is those work records.  Given

6  the fact that they'd be with the jury, I don't see a need to

7  publish those now.

8       THE COURT:  Those are admitted as 299 and 300.

9       (Exhibit Nos. 299 and 300 received into evidence.)

11:19AM 10      MR. BOURBEAU:  At this point, the defense would rest.

11       THE COURT:  Okay.  Let me see counsel at sidebar.

12       (THE FOLLOWING OCCURRED AT SIDEBAR:)

13       THE COURT:  Is there any responsive evidence from the

14  government?

15       MR. MacKINLAY:  No, your Honor.

16       THE COURT:  Do you want to renew your motion?

17       MR. BOURBEAU:  I'm renewing the motion.

18       THE COURT:  Okay.  The motion is denied.  Anything

19  else?  I'll send the jury home.

11:20AM 20      MR. MacKINLAY:  No, your Honor.

21       MR. BOURBEAU:  No, your Honor.

22       THE COURT:  Thank you.

23       (SIDEBAR CONFERENCE WAS CONCLUDED)

24       THE COURT:  All right.  Ladies and gentlemen, the

25  evidence is now concluded.  And as I indicated, for a variety

1    of reasons, it makes more sense to start afresh tomorrow with

2    the closing arguments and the jury instructions, so I'm going

3    to send you home for the day.

4         Again, tomorrow morning we'll begin at 9:00 with the

5    government's closing argument, then we'll hear from the

6    defense, the government will be given a very brief opportunity

7    for rebuttal closing.  I will then give you the instructions

8    that you're to follow in deciding the case.  Each of you will

9    have those instructions in writing to read along with me as I

11:21AM 10   read them aloud, and then you will retire to begin your

11   deliberations.

12        Again, we will provide lunch for you.  Once you get

13   the case, you are the masters of your own schedule.  You can

14   take as much time or as a little time as you think is

15   appropriate to decide the case, but you should be prepared to

16   be here until 5:00 tomorrow, and with that it's now, if

17   possible, even more important that you not the case among

18   yourselves or with anyone else or listen to any media reports,

19   and we will see you tomorrow morning at 9:00.

11:21AM 20        THE CLERK:  All rise.

21        (JURORS EXITED THE COURTROOM.)

22        THE COURT:  All right.  Why don't we regroup in maybe

23   about an hour or so, maybe a little less, I'd say at 12:15.

24   Maybe we can wrap up the jury instructions at that point, if

25   not, we can continue into the afternoon.

 1          MR. BOURBEAU:  That's fine, your Honor.  One

 2   housekeeping matter.  As I was marking, I did not mark the

 3   final chart for identification.  I'll mark it now as I.

 4          THE COURT:  I?

 5          MR. BOURBEAU:  Yes, just for identification.

 6          (Exhibit No. I marked for identification.)

 7          THE COURT:  Okay.  So, 12:15 we'll regroup.

 8          MR. PASRICHA:  Thank you, your Honor.

 9          MR. BOURBEAU:  Could Mr. Gonzalez be excused from

11:23AM 10   that?

11          THE COURT:  It's fine with me.  It's a charge

12   conference.

13          (Whereupon, the hearing was adjourned at 11:22 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3    UNITED STATES DISTRICT COURT )

4    DISTRICT OF MASSACHUSETTS ) ss.

5    CITY OF BOSTON )

6

7            I do hereby certify that the foregoing transcript was

8    recorded by me stenographically at the time and place aforesaid

9    in Criminal Action No. 15-10338-FDS, UNITED STATES vs.

10   EDWIN GONZALEZ and thereafter by me reduced to typewriting and

11   is a true and accurate record of the proceedings.

12           Dated this 20th day of June, 2018.

13                        s/s Valerie A. O'Hara

14           _____

15                    VALERIE A. O'HARA

16                    OFFICIAL COURT REPORTER

17

18

19

20

21

22

23

24

25