**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**EDWIN GONZALEZ, a/k/a "SANGRIENTO"** | Criminal No. 15-10338-FDS |

### SENTENCING MEMORANDUM OF THE UNITED STATES

Edwin Gonzalez a/k/a "Sangriento" is a violent member of MS-13 who was the driving force behind the brutal murders of two teenagers. Following a multi-week trial, a jury found him guilty of racketeering conspiracy and held him responsible for the murders of both 15-year-old Wilson Martinez and 16-year-old Cristofer de la Cruz.

On September 7, 2015, Gonzalez played a critical role in luring Martinez to Constitution Beach in East Boston, where Gonzalez and three other MS-13 members repeatedly stabbed the young boy with large knives, leaving him bleeding to death with approximately 33 sharp force injuries.

Not content with just taking one life, on January 10, 2016, Martinez played a critical role in luring and murdering De la Cruz, who was stabbed, hacked, and shot to death on a public street in East Boston. Gonzalez and the others stabbed the young boy so many times that they left him with 48 sharp force injuries, and they slashed the victim with such force that they damaged the blades of their large knives on the victim's skull.

The nature and circumstances of Gonzalez's crimes were cruel, horrific, and irretrievably devastating to the families of his victims. Each of the murders committed by Gonzalez independently deserves a sentence of life in prison, but especially when taken together, justice demands, and protection of the public requires, life in prison.

I. **The Nature and Circumstances of the Offense and Other 18 U.S.C. § 3553(a) Factors Support a Sentence of Life in Prison.**

MS-13 is one of the most violent and dangerous criminal organizations operating in the United States today. *See generally* PSR at ¶¶ 9-20. Gonzalez was a member of the Molinos Locos Salvatrucha clique of MS-13. *Id.* at ¶ 21. The Molinos clique was a violent MS-13 clique operating in Massachusetts, and two others members of the Molinos clique (Oscar Duran a/k/a "Demente" and Henry Parada Martinez a/k/a "Street Danger") were also involved in, and pled guilty to, racketeering conspiracy involving murder. *Id.* at ¶ 22.

At Gonzalez's trial, the government introduced significant evidence of Gonzalez's membership in MS-13 and the Molinos clique, including testimony from multiple cooperating witnesses, evidence from Gonzalez's personal cell phone, photographs of him wearing MS-13 colors and making MS-13 gang signs, weapons such as large knives and machetes, and recordings of various MS-13 members about Gonzalez and the conspiracy, as well as admissions by Gonzalez himself that were captured on tape. The evidence made clear the mission, means, and methods of this violent criminal enterprise.

The evidence also made clear that MS-13's very existence poses an intolerable threat to the community given that the gang's core operating principles promote and require extreme violence. For example, an MS-13 recruitment/promotional video that references Gonzalez [Sangriento] by name—and that was posted publicly on YouTube after Gonzalez heard the song—makes clear how MS-13 and the Molinos clique celebrate and promote extreme violence:

> *We are exploding the chavalas.*
> *With all my homeboys, we are dicing their faces,*
> *While their families are looking for their bodies.*
> *...*
> *We continue killing the snitches and we continue*
> *Hanging out as if nothing had happened.*

> *...*
> *This song is for those from my clique who control the streets.*
> *The main dudes from the Molinos Locos Salvatrucha.*
> *Here or anywhere, we flash the Mara.*
> *This is from my heart to all El Salvador, because we are dudes*
> *That are shutting people up.*
> *...*
> *The Molinos clique will not leave you alive,*
> *Only minced meat, because we are killers.*
> *...*
> *I also don't deny it, I like to kill culeros,*
> *To leave them chopped in pieces.*
> *...*
> *I don't tire of killing with all my homeboys.*
> *We are Molinos Locos, we bury you in little pieces,*
> *And we blow your head off.*
> *This is not just talk; this is my life.*
> *I will continue killing chavalas.*
> *...*
> *What's up, SANGRIENTO,*
> *DEMENTE. What's up, HAPPY?*
> *To all the dudes who flash the M and the S,*
> *Sons of bitches! What's up, sons of bitches?*
> *Molinos Locos Salvatrucha!*

PSR, ¶¶ 24-30. Unfortunately, through his actions, Gonzalez proved that these words were not mere puffery or bravado, but a mission statement for him to follow.

### A. The September 7, 2015 Murder of Wilson Martinez

On September 7, 2015, Martinez and MS-13 members Henry Parada Martinez a/k/a "Street Danger" (Molinos clique), Carlos Melara a/k/a "Criminal" (ELS clique), and Rene Mejia Flores a/k/a "Gasper" (ELS clique), lured and murdered 15-year-old Wilson Martinez on Constitution Beach in East Boston. *Id.* at ¶ 32-46.

MS-13 members suspected Martinez of being a member of the rival 18th Street gang. *Id.* at ¶ 33. Given MS-13's mission to kill gang rivals, MS-13 members led by Gonzalez made a plan to lure and kill Martinez at Constitution Beach. *Id.* Gonzalez lured Martinez by pretending to be a girl on Facebook who was interested in meeting Martinez

for a date; Melara, pretending to be a relative of the girl that Martinez was planning to meet, picked up and drove Martinez to the beach on the night of the murder; and once Melara brought Martinez to the beach, Gonzalez and the others took turns stabbing the victim to death.  *Id.* at ¶ 34.

The details of the murder were chilling.  Gonzalez and the others hid on the beach in a dark, unlit area, as if waiting for their prey to arrive.  *Id.* at ¶ 40.  When Malara arrived with Martinez at the scene, Gonzalez and the others surrounded the victim, initially pretending that they were committing a robbery.  *Id.*  Gonzalez took the victim's phone and wallet and directed him to walk to a more remote and darker area, where Gonzalez directed the victim to lie face down on the ground.  *Id.*  Once the teenage boy was vulnerable and defenseless on the ground, the group attacked, with Gonzalez and Parada Martinez stabbing the victim multiple times while Melara and Mejia Flores punched, kicked, and threw large rocks.  *Id.* at ¶ 41.  As they were about to leave after believing they had killed the victim, the victim appeared to move, so the group "went back to finish him." *Id.* at ¶ 42.  The assailants then exchanged knives and kept stabbing Martinez, stopping only when the knife that Melara was using snapped in the victim's chest as Melara was trying to stab him in the heart.  *Id.* at ¶ 43.

At Gonzalez's direction, the assailants threw the murder weapons into the water off the beach.  *See id.* at ¶ 47.  After getting rid of the murder weapons, Gonzalez and the others left Martinez bleeding to death on the beach.  The body of the 15-year-old victim was found the next morning by a random beach-goer.  (Some of the less gruesome crime scene photographs were introduced at trial.)  The cold-hearted way in which Gonzalez and others killed Martinez and left his body further adds to the extremely disturbing nature and circumstances of the offense.

The medical examiner's testimony confirmed the significant trauma suffered by Martinez at the hands of Gonzalez and the other murderers. The autopsy found numerous blunt force injuries to the victim's extremities (where Martinez had been punched and kicked); multiple blunt force injuries to the victim's head, including multiple skull fractures (where Martinez had been struck by large rocks); and 33 sharp force injuries to the torso (where Martinez had been stabbed by Gonzalez and the others). *Id.* at ¶ 48. Many of the sharp force injuries consisted of deep wounds that were consistent with a knife being plunged into the body, including multiple wounds to the chest where the "depth of perforation" was over four inches. *Id.*

Other evidence introduced at trial corroborated the manner and means by which Gonzalez and his co-conspirators murdered Martinez. Among other things, law enforcement officials recovered both murder weapons used by the attackers, including both parts of the broken knife used by Melara. *Id.* at ¶ 47. The tip of the knife that broke when Melara was stabbing Martinez in the chest was recovered near the victim's body on September 7, 2015. *Id.* This broken knife-edge contained DNA that matched the DNA profile of the victim's blood:



In March 2016, a dive team from the Massachusetts State Police recovered the other part of the broken knife from the waters off Constitution Beach.  *Id.*



A forensic examiner performed a physical match examination between the broken knife-edge found near the victim and the broken knife found in the water, confirming this knife as one of the murder weapons.  PSR at ¶ 40.

From the waters off Constitution Beach, law enforcement also recovered the other knife used by the attackers, described as a very large knife with an orange handle used by Gonzalez.  *Id.*



6

Gonzalez and the others used these large knives to stab a 15-year-old boy approximately 33 times and left him bleeding to death on a public beach. Even as murders go, the nature and circumstances of this murder were especially troubling and deserving of life in prison. It is hard to imagine a crime more deserving of punishment, incapacitation, and deterrence than a murder where a violent street gang lured a 15-year-old boy for weeks, took him to a public beach where the innocent boy believed he was meeting a girl, and then ambushed him and repeatedly stabbed him to death. This crime, alone, deserves a sentence of life in prison.[1]

For his role in the cold-blooded murder of Wilson Martinez, on December 7, 2015, MS-13 members promoted Gonzalez from "chequeo" to a full-fledged "homeboy" in the gang. *Id.* at 49.

---

[1] The government anticipates that the defense will argue for something less than life in prison because one or more other murder defendants in this case received less than life in prison. All those cases are distinguishable. For one thing, this murder by Gonzalez was more heinous and more well-planned (i.e., more cold-blooded and heartless) than the murders committed by others who received less than life in prison. (Out of the six murders in this case, arguably the only murder that was as well-planned was the second murder that Gonzalez committed, discussed below.) Second, any of the other murder defendants who received less than life in prison received a lower sentence—as contemplated by the Guidelines—based largely on acceptance of responsibility.

Gonzalez did not plead guilty and did not accept responsibility. The government has been unwavering in its position that it would seek life in prison for any defendant who was responsible for a murder and who did not accept responsibility. Even if the jury had found Gonzalez responsible for *only* this one murder, the government would still have sought, and the Court should still have imposed, a sentence of life in prison after trial (as the Court recently did in the case of co-defendant Hector Enamorado after he was found responsible by a jury for a murder).

### B. The January 10, 2016 Murder of Cristofer de la Cruz

Not content with having already killed one teenager and having already been made a homeboy in MS-13, Gonzalez's hunger for violence continued, as he next turned his attention to luring and murdering 16-year-old Cristofer de la Cruz. On January 10, 2016, Gonzalez and three other MS-13 members—Edwin Diaz a/k/a "Demente" (Westers clique), Jairo Perez a/k/a "Seco" (TLS clique), and Rigoberto Mejia a/k/a "Ninja" (TLS clique)—murdered De la Cruz on a public street after Gonzalez lured the victim to his death by following the same *modus operandi* as the Martinez murder. *Id.* at ¶¶ 50-51.

Similar to the murder of Martinez, Gonzalez targeted and pursued De la Cruz because he believed the victim was associated with the rival 18th Street gang. *Id.* at ¶ 52. Similar to the murder of Martinez, Gonzalez lured the victim to his death by pretending to be a girl that was interested in meeting the teenage victim for a date. *Id.* At trial, the government introduced weeks of Facebook communications between De la Cruz and an account controlled by Gonzalez. *Id.* In the second murder, Gonzalez went further and personally went to pick the victim up and bring him to the scene of his death. *Id.* at 57.

The murder of De la Cruz was made more tragic by the fact that De la Cruz had previously survived an attempt on his life by MS-13 members. *Id.* at 55. In May 2015, De la Cruz had been stabbed numerous times by co-conspirators Brayan Galicia Barillas a/k/a "Chucky" and Domingo Tizol a/k/a "Chapin." The victim survived and moved to the Worcester area for his safety. *Id.* Gonzalez not only knew about this prior attempted murder, but also used the prior attack to gain the victim's trust by appearing to be a sympathetic teenage girl who was in love with De la Cruz. *Id.* at 56. Gonzalez also knew that the victim was a potential witness against the MS-13 members who had previously attempted to murder De la Cruz. *Id.*

8

The murder of De la Cruz thus allowed Gonzalez to further both of the key operating principles and missions of MS-13: murdering those who are believed to be rivals and murdering those who are believed to be witnesses or informants. As Gonzalez was caught on tape stating, the murder was like killing "two birds with one stone ... a culero [gang rival] and a witness." *Id.*

When Gonzalez brought the victim to East Boston, Perez, Diaz, and Mejia were waiting. *Id.* at ¶ 58. Gonzalez, Perez, and Diaz were each armed with large knives that they called machetes, and each stabbed and hacked the young victim multiple times. *Id.* While they were doing that, Mejia ran up and fired multiple shots at the victim. *Id.* Gonzalez and the others then left the young boy bleeding to death on the sidewalk. *Id.*

As the Court saw a glimpse of during Gonzalez's trial, the injuries inflicted by Gonzalez and the others were gruesome and unimaginably cruel. The autopsy revealed that the young victim suffered 48 sharp force injuries, multiple gunshot wounds, and multiple blunt force injuries. *Id.* at ¶ 59. In addition to the number of wounds, the severity of the wounds was also notable. *Id.* at ¶ 60. The victim's left hand had been nearly severed from his arm, and the evidence suggests that this occurred when the victim raised his hand to shield his head from an impending blow, and the knife/machete cut through his hand instead of his skull. *Id.*

Despite the victim trying desperately to shield his head, Gonzalez and the others struck the victim on the head multiple times, and many of the 48 sharp force wounds were injuries to the victim's head. *Id.* at ¶ 61. Gonzalez and the others struck the victim with such force that they left pieces of their metal blades embedded in the victim's skull. *Id.* All three large knives used in the attack were recovered and were found to have damaged blades and the victim's DNA on them. *Id.*

Further, Gonzalez was captured on tape admitting that his machete was damaged with the force of the strike on the victim's head, stating, "when I was stabbing the guy, [it was] as if I were cutting into rocks." *Id.* Although it is unclear which defendant used which knife, the knives present a ghastly picture:







Significant other evidence at trial corroborated the details about the manner in which Gonzalez and the others murdered De la Cruz. For example, in a sickening conversation captured on tape about the murder, co-defendant Perez stated that "the dude was left completely destroyed" and "in pieces," and "Sangriento whacked the guy's hands with a machete." (The government does not intend to introduce autopsy photographs at sentencing, but notes that these statements about the condition in which Gonzalez and the others left the victim were, unfortunately, true as a general matter.)

10

The callous nature of the crime is magnified by the fact that Gonzalez and the others committed this murder on the sidewalk of a densely populated, residential street in East Boston.  (The murder occurred barely a block from East Boston High School.)



Gonzalez was the driving force behind a brutal gangland murder where Gonzalez personally lured the teenage victim for weeks, personally went to pick up the victim and bring him to his death, and personally stabbed and hacked the victim along with two others as a fourth gang member shot at the boy, before the group left the victim bleeding to death on a public sidewalk.

As with the first murder Gonzalez committed, this crime, alone, deserves a sentence of life in prison, and any lower sentence would not reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence, or protect the public from further crimes of the defendant.  That this murder occurred months after a separate murder where the defendant and others stabbed and hacked another teenage boy before leaving him to bleed to death on a public beach only makes this offense more deserving of life in prison.

## II.     The Guideline Sentencing Range is Life in Prison.

The U.S. Probation Office correctly calculated the defendant's offense level at 43 and correctly calculated the defendant's Guideline Sentencing Range as life in prison. The government comments only briefly on the various objections raised by the defense to the calculations of the Guideline Sentencing Range:

*First*, by the plain terms of the Sentencing Guidelines, the first-degree murder guideline in USSG § 2A.1.1 applies to the indisputable facts of this case, and the defendant's base offense level should be 43. As Application Note 1 to U.S.S.G. § 2A1.1 makes clear, "This guideline applies in cases of premeditated killing." In a case where the defendant lured two separate teenage victims for weeks and two different sets of MS-13 members were present at two different scenes to help the defendant commit two different murders, there can be no reasonable doubt that the defendant is responsible for a premeditated killing. Indeed, in this case, both murders were premeditated.

*Second*, given that the first-degree murder guideline applies, the Sentencing Guidelines also make clear that the appropriate sentence is life in prison. "In the case of premeditated killing, life imprisonment is the appropriate sentence if a sentence of death is not imposed. A downward departure would not be appropriate in this case." U.S.S.G. § 2A1.1, Application Note 2.

*Third*, given the application of the first-degree murder guidelines, the Court need not decide the rest of the defendant's objections to the guideline calculations. *See, e.g.*, Objection 7 (objecting to vulnerable victim enhancement); Objection 8 (objecting to enhancement for use of a minor); Objection 10 (objecting to enhancement for role in the offense). Given that the Sentencing Table caps off at offense level 43, the enhancements do not technically enhance the defendant's Guideline Sentencing Range of life in prison.

To the extent that the Court is inclined to affirmatively rule on the objections, each of the enhancements applied by Probation are more than supported by the factual record, resulting in an initial offense calculation of 52. *See* PSR, ¶¶ 74-94. If the Court is inclined to rule on the objections, the government will be ready at sentencing to support each enhancement and provide the Court with an alternate way of reaching a maximum total offense level of 43.

In either instance, a sentence of life in prison is a Guideline sentence, and in the unlikely event that it were not, the 18 U.S.C. § 3553(a) factors would still call for a sentence of life in prison given the nature and circumstances of the offense, the history and characteristics of the defendant, the need to afford adequate deterrence, and the need to promote respect for the law.

## Conclusion

Gonzalez's heinous murders not only justify, but demand, a sentence of life in prison. Gonzalez's own words make clear that had law enforcement not arrested him in January 2016, he would have killed again. As he stated on January 11, 2016, the day *after* he committed his *second* murder, "Later, we're going to leave all of them chopped to pieces also." PSR, ¶ 68. Gonazales has earned, and deserves, a sentence of life in prison.

        Respectfully submitted,

        ANDREW E. LELLING
        United States Attorney

By:   /s/ Kunal Pasricha
       Kunal Pasricha
       Glenn A. MacKinlay
       Assistant United States Attorneys

## **CERTIFICATE OF SERVICE**

    I, the undersigned, certify that the foregoing document was filed through the Electronic Court Filing (ECF) system and will be sent electronically to the registered participants as identified in the Notice of Electronic Filing.

                                                  /s/ Kunal Pasricha
                                                  KUNAL PASRICHA
                                                  Assistant United States Attorney